Justin ANDERSON *v.* STATE of Arkansas

CR 02-910 163 S.W.3d 333

Supreme Court of Arkansas
Opinion delivered April 29, 2004

[Rehearing denied June 3, 2004.]

184

*Janice Vaughn*, Arkansas Public Defender Commission, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

R OBERT L. BROWN, Justice. Appellant Justin Anderson appeals his judgment of conviction for capital murder and his death sentence. We affirm his judgment of conviction, but we reverse and remand the case for resentencing.

On the morning of October 12, 2000, eighty-seven-year-old Clara Creech was found shot to death in the front yard of her home. During the investigation into her death, police investigators obtained Anderson's name as a suspect in Ms. Creech's murder. After talking with Anderson's brother, Maurice, who implicated Anderson in the Creech murder, state police officers went to Anderson's home in Lewisville. Anderson was nineteen years old at the time. At about 2:30 p.m. that same day, Anderson, according to Sergeant Jeff Jester of the Arkansas State Police, was advised that he was free to leave, that he was not under arrest, and that the police wanted him to accompany them downtown to answer some questions. He was handcuffed and went with the state police officers to the Lafayette County Sheriff's Office. At some point during this time frame, Anderson was advised of his *Miranda* rights.

At 5:50 p.m. that afternoon, Anderson completed and signed a *Miranda* rights form, after being read his rights. State police officers then questioned him regarding Ms. Creech's death. The entire police interrogation lasted approximately six hours, with two to three breaks. At no time during the initial interrogation did Anderson admit to any involvement in Ms. Creech's murder.

Following the initial interview, Maurice Anderson asked to see his brother. After Justin Anderson returned from visiting his brother, Sergeant Jester observed that he was visibly upset. He asked Justin Anderson if he or his brother had killed Ms. Creech. Justin Anderson responded that he had killed Ms. Creech and agreed to give a statement. Upon the arrival of Jerry Digman, a criminal investigator with the Arkansas State Police, Anderson was advised of his right to silence and right to an attorney. The interview, conducted at 1:48 a.m. on October 13, 2000, was tape recorded. At that time, Anderson said he understood his *Miranda* rights and that he understood he had the right to remain silent and the right to an attorney. He stated that he was ready to talk and told the investigators that he "shot the old lady in the back." He then stated that he hid the gun he had used in a vacuum cleaner. He also provided additional details about the murder, such as what he was wearing at the time.

Specifically, Anderson told police that he shot Ms. Creech at 9:00 a.m. "outside . . . by the road" while she was bending down,

after he approached her from the back. He further told the investigators that he tried to get into her house by kicking the front door. At that time, Anderson told the investigators that he had found the gun used in the killing behind the trash barrel. He added that he had never shot anybody before, although it had crossed his mind about shooting somebody. He further stated that there was "just something" in him, that life seemed unimportant, and that there was no reason he picked Ms. Creech.

At the conclusion of that interview, Anderson was arrested. He took the investigators to a gun which was located near the Masonic Lodge. On their return to the Lafayette County jail, Investigator Digman mentioned the recent shooting of a truck driver, but Anderson said he did not want to talk about it until they returned to the sheriff's office. On reaching the sheriff's office, Anderson gave a second statement to the investigators at 2:26 a.m. After confirming that he still understood his rights, Anderson admitted to shooting a truck driver whose vehicle was parked at the In and Out (hereinafter, the "Solvey" case).[1] He further admitted that he had broken into a home a few weeks before the truck incident to steal the two guns which he had used in shooting the truck driver and Ms. Creech.

Anderson was charged with premeditated and deliberate capital murder. He subsequently moved to suppress his two statements, and that motion was denied. Following an eight-day trial from January 22, 2002, to January 31, 2002, on the charge of capital murder, the jury convicted Anderson and sentenced him to death.

## I. Suppression of Confessions

Anderson first contends that he did not make a "knowing and intelligent" waiver of his *Miranda* rights, because of his diminished mental capacity and his alleged intelligence quotient of 65. He further asserts that he should have been advised of his *Miranda* rights when he was first handcuffed at his residence and that the state police officers failed to comply with Arkansas Rule of Criminal Procedure 2.3 in that they did not make it clear that he

---

[1] Anderson was later convicted for the attempted capital murder of Roger Solvey, the driver of the truck. That conviction was affirmed by the court of appeals in an unpublished opinion. *See Anderson v. State*, CA CR 02-582 (Ark. App. Feb. 26, 2003) (*Anderson I*). The jury trial in the *Solvey* case occurred before the jury trial in the instant case.

did not have to go to the sheriff's department. He maintains that his remarks to the police investigators were the result of intimidation, coercion, and promises of leniency and that the State failed to call Lieutenant Cleve Barfield who was a material witness at either the suppression hearing or the trial. To summarize, he contends that he "was a vulnerable 19 year old mentally retarded boy who after 13 hours of interrogation finally told the police what they wanted to hear."[2]

### a. Material Witnesses

We first address Anderson's contention that the prosecutors failed to call all material witnesses, specifically Lieutenant Barfield of the state police. Anderson did take the stand in the suppression hearing in the instant case, but he did so only to state that he was not going to testify. Moreover, he did not testify at trial.

■ We hold that Lieutenant Barfield was not a material witness. In *Foreman v. State*, 321 Ark. 167, 901 S.W.2d 802 (1995), this court repeated that where an accused has offered testimony that his confession was induced by violence, threats, coercion, or offers of reward, the State has the burden to produce all material witnesses who were connected with the controverted confession or give an adequate explanation of their absence. Here, because Anderson declined to testify, he did not offer testimony that his confession was induced in any way. Where there is no specific evidence to refute, the State's burden to produce all material witnesses does not arise. *See Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884 (2002) (overruled on other grounds). This issue has no merit.

### b. Diminished Capacity

■ Anderson next claims that his statements were coerced due to his diminished mental abilities. We disagree that this issue was presented to the circuit court at the suppression hearing. A 1996 psychological evaluation report by Dr. Paul Deyoub, which concluded that Anderson at that time had a full-scale IQ of 65, was part of the record, but it was never referred to or entered into

---

[2] Although the court of appeals ruled on the suppression issue in its unpublished opinion on February 26, 2003, we do not consider that opinion to be law of the case because it is not the same case involving the same charge.

evidence during the suppression hearing. Moreover, no argument was made at the hearing regarding the import of this report and its significance on the issue of whether Anderson could give ·a voluntary statement.[3] The 1996 forensic report was submitted to the court during the course of pretrial motions, but it was only submitted in support of Anderson's motion to prohibit the State from seeking the death penalty under Ark. Code Ann. § 5-4-618 (Repl. 1997). This issue is meritless.

### c. Maurice Anderson as a Coercive Force

■ Anderson further asserts that he was coerced to give a statement by Maurice. He claims, specifically, in his reply brief that the State neglected to address the state police investigators' use of his brother to coerce his confession. However, a review of Anderson's initial brief on appeal reveals that there was no development of this argument. All that was said was: "Yet, [Maurice] too, played a critical role in coercing Justin into confessing." An argument consisting of one statement is insignificant to mount the issue of coercion on appeal.

### d. Length of Interrogation

Anderson further maintains that he was the victim of a thirteen-hour interrogation, and that the length of time had a coercive effect. Again, we disagree. A review of the record reveals that Anderson signed a *Miranda* rights waiver form at 5:50 p.m. and that breaks were taken three times: at 5:50 p.m., at 9:00 p.m., and at 11:00 p.m.[4] The breaks lasted from "fifteen to thirty minutes, thirty to forty-five minutes." He then gave his two statements: one at 1:48 a.m. and the second at 2:26 a.m.

■■ When reviewing whether a statement was voluntary and not the product of intimidation, coercion, or deception, this court makes an independent determination based on the totality of the circumstances, reversing only if the trial court was clearly erroneous. *See Branscum v.State*, 345 Ark. 21, 43 S.W.3d 148 (2001). Relevant factors to be considered include the age, educa-

---

[3] While Anderson's motion to suppress asserted unknowing and involuntary waiver and coercion and intimidation, it did not refer to any diminished mental capacity.

[4] Part of the evidentiary basis for the *Miranda* warning and breaks comes from the suppression hearing in the *Solvey* case which was made part of the record in the instant case.

tion, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of mental or physical punishment. *See id.* Anderson was nineteen, had previous experience in the criminal justice system, was *mirandized* on several occasions, and took breaks during the interrogation. Though the length of the interrogation is one factor to be considered, it is not determinative. *See Williams v. State,* 338 Ark. 97, 991 S.W.2d 565 (1999). In light of the evidence presented to the circuit court, we cannot say that the court erred in concluding that Anderson's statements were voluntarily made and not coerced.

### e. Failure to Advise of Miranda Rights at Initial Handcuffing

■ Anderson makes a brief assertion that he should have been *mirandized* at the time state police officers initially approached him and handcuffed him. The testimony of Sergeant Jester of the state police reveals that when Anderson initially accompanied police investigators back to the sheriff's office, he was not under arrest. Officer Jester further testified that prior to their departure for the sheriff's office, he remembered Lieutenant Barfield telling Anderson that he was free to leave and that he was not under arrest at that time. Officer Jester further testified that he knew Lieutenant Barfield *mirandized* Anderson "thoroughly" at the scene. He did testify that after the lieutenant received consent to search from the owner of the residence, "[Barfield] came out . . . and verbally Mirandized [Anderson]." This testimony supports the State's position that Anderson was *mirandized* prior to accompanying police officers to the sheriff's office, which was sufficient. This argument is without merit.

### f. Failure to Comply with Ark. R. Crim. P. 2.3

■ ■ Anderson contends that his rights under Arkansas Rule of Criminal Procedure 2.3 were violated. Rule 2.3 provides: "If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, . . . he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request." Again, Officer Jester testified that although he could not remember at exactly what point it occurred, he did hear Lieutenant Barfield advise Anderson that he was free to leave and was not under arrest at that time, prior

to their departure to the sheriff's office. This court has observed that Rule 2.3 "does not require an explicit statement that one is not required to accompany the police; rather, the police only need to take such steps as are 'reasonable to make clear that there is no legal obligation to comply' with the request to come to the police station." *Shields v. State*, 348 Ark. 7, 14, 70 S.W.3d 392, 395 (2002). Here, there is evidence that an explicit statement was made to Anderson that he was not under arrest and was free to leave. This advice by law enforcement adequately supports the State's position that it was clear to Anderson that he was not required to go to the sheriff's department.

## II. Other Bad Acts and Crimes

Anderson next argues that the evidence of the burglary of Jeannie Magee's home and the Solvey shooting was admitted solely to show that he is a bad person and to inflame the jury against him. He asserts that this evidence was unduly prejudicial and was not relevant to prove intent. Further, he asserts that even if evidence of the Solvey shooting was relevant to the Creech murder, evidence of the Magee burglary was clearly not relevant. Anderson also asserts that it was error to allow testimony about guns and ammunition discovered at Anderson's home, but which were not tied to Ms. Creech's murder or the Solvey shooting.

The general rule is that evidence of other crimes by the accused, not charged in the indictment or information and not a part of the same transaction, is not admissible at the trial of the accused. *See Smith v. State*, 351 Ark. 468, 95 S.W.3d 801 (2003). However, Arkansas Rule of Evidence 404(b) provides that evidence of other crimes, wrongs, or acts may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See McCoy v. State*, 354 Ark. 322, 123 S.W.3d 901 (2003). *See also* Ark. R. Evid. 404(b). The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, and this court will not reverse absent a showing of manifest abuse of that discretion. *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000).

In *Smith v. State, supra,* this court commented on the issue of independent relevance and precisely when evidence of other crimes may meet that criterion:

> This court has further made it clear that if the introduction of testimony of other crimes, wrongs, or acts is independently relevant

to the main issue—relevant in the sense of tending to prove some material point rather than merely to prove that the defendant is a criminal—then evidence of that conduct may be admissible with a proper cautionary instruction by the court. *Clem v. State*, 351 Ark. 112, 90 S.W.3d 428 (2002). Thus, if the evidence of another crime, wrong, or act is relevant to show that the offense of which the appellant is accused actually occurred and is not introduced merely to prove bad character, it will not be excluded. *Id.* Stated another way, the test for establishing motive, intent, or plan as a Rule 404(b) exception is whether the evidence of the other act has independent relevance. *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000); *Haire v. State*, 340 Ark. 11, 8 S.W.3d 468 (2000). *See also Burley v. State*, 348 Ark. 422, 73 S.W.3d 600 (2002) (prior bad acts independently relevant to prove motive in not contacting police); *Williams v. State*, 343 Ark. 591, 36 S.W.3d 324 (2001) (prior crime independently relevant as proof of intent to commit charged offenses); *Eliott v. State*, 342 Ark. 237, 27 S.W.3d 432 (2000) (escape conviction was not used to show appellant's character, but was independently relevant to show his consciousness of guilt of the rape offenses).

351 Ark. at 473, 95 S.W.3d at 804 (footnote omitted).

 In the case before us, Anderson's 2:26 a.m. statement, which was his second statement, reveals that he admitted to committing both the Magee burglary and the Solvey shooting. He told the investigators that about three days prior to shooting Ms. Creech:

> . . . I was planning to shoot someone, but I didn't, I didn't really know, you know, I didn't pinpoint anyone. It was just shoot, shoot someone. So I went out walking one night and it started raining real hard, and I walked upon by In and Out parking lot by the firecracker stand. And [a] diesel was parked pretty close to the firecracker stand. And you know, I thought, you know, this could be my, this could be my chance. So, I walked up on this diesel and stepped up on the ramp and opened the door and got in and when I seen [Solvey], I just shot repeatedly.

Regarding the Magee burglary, Anderson said in his statement:

> A couple of weeks before the truck stop accident I figured I'd break in a house. And I pretty much knew what I was looking for. Guns. And I knew this person had a gun. Cause I used to be friends with him.

We conclude that the State was entitled to present evidence of where Anderson obtained the gun used in the Creech murder. In addition, it was just prior to the Solvey shooting that Anderson formed the intent to take a life, as his own statement demonstrates. Moreover, in his 1:48 a.m. statement, the first statement, Anderson told police officers that life just seemed unimportant and that there was no reason in particular that he chose to kill Ms. Creech. The charge against him was premeditated and deliberate capital murder. As the circuit court found, although the evidence of Anderson's other crimes was prejudicial, it was not unfairly prejudicial, as it was more probative of a plan and intent to steal guns for use in killing someone. Jeannie Magee's father, William Magee, testified that the two guns introduced into evidence, Exhibits 46 and 53, were guns he had given his daughter.[5] While Exhibit 46 was not tied to either shooting, it was evidence of the Magee burglary, which again was probative of a plan and intent to steal guns. We conclude that the circuit court did not abuse its discretion in denying Anderson's motion either to redact the statements or in denying Anderson's motion in limine.

### III. The Solvey Shooting

For his next point, Anderson argues that the circuit court erroneously permitted the State to treat all three crimes, *i.e.*, the Magee burglary, the Solvey shooting, and the Creech murder, as one continuing criminal episode during the guilt phase of the trial and then did an about-face and permitted the State to use the Solvey shooting as an aggravator and a separate prior violent felony during the sentencing phase.

The State argues that this precise argument was not made to the circuit court. Anderson counters that he objected each time the Magee burglary or Solvey shooting was mentioned. We agree with Anderson that the issue he raises about the necessity for the circuit court to intervene to correct a serious error is one requiring review under Arkansas Rule of Appellate Procedure—Criminal 10. *See also Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

Anderson's assertion, however, is meritless. As already referenced in this opinion, the introduction of the Magee

---

[5] Exhibit 46, a Smith & Wesson model 60 pistol, was located in a vacuum bag at Anderson's residence, and does not appear to have been linked to either shooting. Exhibit 53, a Lady Smith & Wesson .38 with a laser sight, was linked by state crime lab investigators to both the Creech murder and Solvey shooting.

burglary and the Solvey shooting during the guilt phase of the trial was necessary for the State to meet its burden of proving Anderson's premeditated and deliberate intent to kill Ms. Creech.

Anderson relies on this court's decision in *Parker v. State*, 292 Ark. 421, 731 S.W.2d 756 (1987), but that reliance is misplaced. In *Parker*, this court reversed Parker's convictions for capital felony murder based upon the facts of that case. In that case, we observed that the State's evidence showed that Parker had entered the home of his victims with only one purpose — to commit murder. Although Parker committed burglary as well when he entered his victims' home unlawfully to commit the offenses, this court found that the killings were not in the furtherance of the burglary, as required for capital felony murder. We further examined whether the circuit court erroneously instructed the jury on previously committed felonies, when there was no evidence that Parker had previously committed another felony, other than shooting at a third person in the home which took place contemporaneously with the other killings. We noted that Ark. Stat. Ann. § 41-1303(3) (Repl. 1977), dealing with aggravating circumstances, applied to crimes not connected in time or place to the killing for which the defendant has just been convicted. We concluded that because the shooting at this third person was so closely connected in both time and place to the killings, it "did not present a portrait of the defendant as having previously demonstrated a character for violent crimes or a history for committing such crimes." 292 Ark. at 428, 731 S.W.2d at 759.

The *Parker* case is inapposite. Anderson stipulated to the submission of the Solvey attempted capital murder as an aggravating circumstance, as evidenced by the trial court's instruction to the jury:

> . . . Ladies and gentlemen, the parties, the state and the Mr. Anderson [sic] have stipulated that Justin Anderson was previously convicted of another felony, an element of which was the use or threat of violence to another person that created a substantial risk of death or serious physical injury to another person, and have stipulated that there is, or could be, proof beyond a reasonable doubt of that fact. You should accept that as a fact proven to your satisfaction at this trial.

But equally as important, the Solvey shooting was not admitted as part of a criminal episode but to prove intent on the part of Anderson. We find no reversible error on this point.

## IV. Change of Venue

Anderson urges for his next point that the circuit court abused its discretion when it denied his motion for change of venue, because he could not receive a fair trial in Lafayette County. He asserts that not only had there been excessive pretrial publicity in the media, but the majority of people in the Solvey jury panel had some contact with someone involved in the case, be it Anderson himself, Ms. Magee, Ms. Creech, or law enforcement. He contends that his presentation of nine affidavits and the testimony of a local minister, as well as testimony regarding the excessive publicity, demonstrated that bias against him was prevalent throughout the county and that he could not receive a fair trial. He further points to the testimony presented that Ms. Creech's son-in-law, State Representative Russ Bennett, had sent an e-mail to numerous friends and constituents in which he wished to block legislation which would have prohibited the execution of minors and mentioned the recent murder of his mother-in-law by a minor, to wit, Anderson. He maintains that the *voir dire* in this case demonstrates that all persons questioned for this trial, except one, had read about or heard about the case prior to coming to court.

Our Criminal Code relating to change of venue permits the removal of a criminal cause to the circuit court of another county whenever it "shall appear . . . that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had in that county." Ark. Code Ann. § 16-88-201 (1987). This court's standard of review for denial of a motion for change of venue is whether there was an abuse of discretion by the circuit court. *See Taylor v. State*, 334 Ark. 339, 974 S.W.2d 454 (1998).

In the case at hand, Anderson submitted five affidavits in conjunction with his motion for change of venue to the trial court. Each was identical and each affiant averred:

> . . . I do not think [Anderson] could possibly have a fair trial heard by impartial jurors in Lafayette County, Arkansas, because of the negative talk and publicity circulating throughout the county regarding him and his pending court cases. . . . There is great sentiment against Justin Anderson in the community.

> For these reasons, I sincerely believe that there is no way that Justin Anderson could possibly receive a fair trial in Lafayette County, Arkansas, under these circumstances.

At the time of the hearing on the change-of-venue motion, Anderson proffered four additional affidavits and presented testimony from a local minister and Representative Russ Bennett, the son-in-law of Ms. Creech.[6] Anderson's investigator further testified as to the publicity that was generated by the print and visual media. Out of an abundance of caution, the circuit court required the State to put on its proof. The State then presented testimony from several witnesses, after which the circuit court ruled:

> . . . The law requires a high showing, a high standard to be met, essentially, a finding that nobody, that no one in [the] county could sit and hear this case fairly. I do not believe that the defense has met that burden for the reasons indicated at the close of their case in chief yesterday, and particularly, in light of the broad geographic and racial cross-section of witnesses that the state called in response. The entire county and the, all significant ethnic and social economic strata of the county have indicated that they believe the case can be fairly tried here. The motion would be denied at this time, of course, without prejudice to renew it.

In *Bussard v. State*, 300 Ark. 174, 778 S.W.2d 213 (1989), this court observed that there can be no error in the denial of a change of venue if the transcript of the jury-selection process shows that an impartial jury was selected, due to the fact that *voir dire* of the jury provides adequate safeguards against pretrial publicity. The record reflects that in the instant case, the jury members were questioned on the change-of-venue point, and the circuit court concluded that the jurors were impartial. In fact, with the exception of juror number twelve, James Bryant, the defense agreed to each juror. With respect to Mr. Bryant, upon questioning by defense counsel as to whether he was concerned that as a minister he might lose church members were he to return a not-guilty verdict, Mr. Bryant specifically stated that he had no such concern. We conclude that the circuit court did not abuse its discretion in denying Anderson's motion for change of venue.

---

[6] The circuit court ruled that Anderson had leave to file the additional affidavits with the clerk but that they would not be considered as evidence until the affiants were physically offered for examination.

## V. Voir Dire

Anderson next claims that the circuit court committed numerous errors during the course of *voir dire*. First, he asserts that the circuit court erred by failing to conduct *voir dire* in a manner which was adequate to unearth potential prejudice. The circuit court, he continues, interrupted and stifled his questions, and in doing so, prejudiced the jury against the defense. He further maintains that the court erred in allowing the State to question potential jurors about whether they could sign a death-penalty verdict and whether they could impose a death sentence for the murder of a single person. He adds that the prejudice was compounded by the excusal for cause of persons harboring doubts in either instance.[7] Finally, he contends that the court erred in denying his *Batson* challenges without any inquiry into the race-neutral reasons given by the State.[8]

### a. Circuit Court's Voir Dire

For his first argument under this section, Anderson asserts that the circuit court erred in conducting *voir dire* by repeatedly interrupting and stifling defense counsel's questioning of potential jurors. He quotes, in his brief, several instances in which the circuit court limited his counsel's individual *voir dire* of potential jurors to those questions and topics previously approved by the court.

 ██ The extent and scope of *voir dire* is left to the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal absent an abuse of discretion. *See* Ark. R. Crim. P. 32.2; *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004); *Bader v. State*, 344 Ark. 241, 40 S.W.3d 738 (2001). Permitting a general *voir dire* and then a specific, individual *voir dire* falls readily within the circuit court's discretion with respect to the extent and scope of *voir dire*. The exchanges objected to in Anderson's brief deal with questions to the prospective jurors about the following subjects: (a) favoring one child over another; (b) personal knowledge of one who was mentally retarded; (c) the type of domestic

---

[7] Specifically, Anderson challenges the circuit court's excusal for cause of Karen Soils and Emogene Ruple.

[8] Here, Anderson challenges the circuit court's rulings on his *Batson* challenges to the State's peremptory strikes of Charlene Grisham, Mattie Pearl Cooper, Deidre Hamilton, and Sherry Dudley.

violence incurred; and (d) a spouse's employment in the circuit clerk's office. While perhaps intriguing questions based upon the defense's theory of the case, we cannot say that these topics were so plainly appropriate as to sustain a finding that the circuit court abused its discretion in limiting counsel's ability to inquire. *See Bader v. State, supra.* The court did so on the basis that counsel's questions would have been more appropriate during the general *voir dire*, but counsel failed to inquire at that time. There was no abuse of the circuit court's discretion.

### b. Death Penalty Form and Murder of a Single Person

In *Isom v. State, supra*, this court recently observed that the proper test to be used in releasing a prospective juror for cause is whether that person's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions and oath. Jurors in a capital case must be able to consider imposing a death sentence if they are to perform their function as jurors. *See Isom v. State, supra.*

In the instant case, Anderson's counsel objected only twice to the State's questioning on whether the juror could sign a verdict form imposing death on the basis that the law does not require a juror to be able to sign a death verdict.[9] According to defense counsel, the law merely requires the juror to consider death as a punishment. The juror excused for cause on this basis was Karen Soils.

The decision to excuse a juror for cause is left to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *See Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995). The circuit court must decide if the juror's views would prevent or substantially impair performance of his or her duty as a juror, and we give great deference to the circuit court that sees and hears the potential jurors. *See id.*

In *Nooner*, this court concluded that where a juror "could not actually sign her name to a verdict form in which the death penalty was imposed[,]" the juror's views on the death penalty

---

[9] In the first instance, the defense's objection was sustained in part, overruled in part. The juror was later accepted by both the State and the defense. In the second instance, the juror, Karen Soils, was excused for cause.

would have either impaired or prevented her performance as a juror. *Id.* at 98, 907 S.W.2d at 683. The same rationale is applicable in the instant case.

■ Arkansas law requires that the jury shall impose a sentence of death if it *unanimously* returns written findings that: (1) aggravating circumstances exist beyond a reasonable doubt; (2) aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and (3) aggravating circumstances justify a sentence of death beyond a reasonable doubt. *See* Ark. Code Ann. § 5-4-603(a) (Repl. 1997). In addition, AMI Crim. 2d 1008, Form 4, requires that if the jury returns a verdict of death, "each juror must sign this verdict." AMI Crim. 2d 1008, Form 4. Consequently, if a prospective juror states that he or she would be unable to actually sign the verdict form imposing death, his or her views would prevent or substantially impair his or her performance as a juror.

■ Here, Ms. Soils stated that she did not think that she would be able to sign a verdict form imposing the death penalty even if she believed it to be an appropriate case and one that the State had proved beyond a reasonable doubt. Because Ms. Soils indicated that she would be impaired in her ability to perform as a juror due to her inability to sign the form, the circuit court did not err in striking her for cause.

■ The same holds true with respect to the State's questioning of *venire* persons regarding the imposition of death for the murder of a single person. Anderson urges that the State, through this line of questioning, cannot be allowed to ask jurors to commit to a verdict during *voir dire*. And yet it is apparent that the State was simply exploring whether the jurors could follow the court's instructions with respect to capital murder. Once again, the circuit court has great discretion in managing the extent and scope of *voir dire. See Isom v. State, supra; Bader v. State, supra.* We hold that such a question did not lead to a jury organized to return a verdict of death.

*c. Batson*

■ ■ We note at the outset that two African-Americans and at least six women sat on the Anderson jury. In *MacKintrush v. State,* 334 Ark. 390, 978 S.W.2d 293 (1998), this court set forth the three-step procedure for challenges under *Batson v. Kentucky,* 476 U.S. 79 (1986). We summarized the

*MacKintrush* procedure in *Hinkston v. State,* 340 Ark. 530, 10 S.W.3d 906 (2000):

> . . . First, the strike's opponent must present facts to raise an inference of purposeful discrimination; that is, the opponent must present a *prima facie* case of racial discrimination. Second, once the strike's opponent has made a *prima facie* case, the burden shifts to the proponent of the strike to present a race-neutral explanation for the strike. If a race-neutral explanation is given, the inquiry proceeds to the third step, wherein the trial court must decide whether the strike's opponent has proven purposeful discrimination. Here, the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent.

340 Ark. at 538-39, 10 S.W.3d at 911-12 (internal citations omitted). This court will reverse a circuit court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *See id.* We further accord some measure of deference to the circuit court, because it is in a superior position to make determinations of juror credibility. *See id.*

### i. Charlene Grisham

After the State excused Ms. Grisham, Anderson's counsel challenged her excusal under *Batson* on the sole basis that she was African-American. Although the circuit court did not believe that a *prima facie* case had been made, the court directed the State to offer its race-neutral reason for the strike. The State pointed to the fact that it did not find Ms. Grisham to be credible as she made a "turn about" when she said at first that she did not believe in the death penalty and then said that she could actually vote for it.

This court has observed that the State's race-neutral explanation must be more than a mere denial of racial discrimination but need not be persuasive or even plausible, and, indeed, may even be silly or superstitious. *See Hinkston v. State, supra; MacKintrush v. State, supra.* The State's explanation was that Ms. Grisham was inconsistent in her responses regarding her views on the death penalty. That qualifies, and we find no abuse of the circuit court's discretion.

### ii. Mattie Pearl Cooper

When the State exercised its peremptory challenge against Mattie Pearl Cooper, defense counsel raised a *Batson*

challenge and asserted that Ms. Cooper was the "second black person that the state has excused, which would exhibit a pattern of excusing people on the basis of their race." The State, upon prompting by the circuit court, explained that Ms. Cooper "gave an uncanny account of what the facts of this case would be" and "said she didn't know anything about this case, although she claims to be one of the best friends of the grandmother of the defendant." The State further commented that it had participated in many prosecutions of Ms. Cooper's sons and had sent them to the penitentiary. The circuit court concluded that two race-neutral reasons had been provided by the State. We agree with the circuit court.

### iii. Deidre Hamilton

When the State struck Deidre Hamilton, Anderson made a *Batson* challenge. He asserted that the State had exercised three strikes, all against African-Americans. He further argued that the use of those strikes showed a pattern of discrimination. The prosecutor responded that Ms. Hamilton failed to make eye contact with him and that he did not feel very comfortable with the responses she was giving. Additionally, the prosecutor pointed to the fact that he had prosecuted Ms. Hamilton's ex-husband, and that she had accompanied him on cases in which he was found guilty. The circuit court ruled that the State had provided a race-neutral explanation which was the prior prosecution of her former husband by a member of the current prosecution team. We agree that this was a race-neutral explanation.

### iv. Sherry Dudley

Following the State's strike of Sherry Dudley, Anderson again objected under *Batson* and argued that the State had exercised or demonstrated a pattern of excusing women from the jury panel. The State responded that the circuit court had made findings on each of Anderson's previous *Batson* challenges that they were for race-neutral reasons. The State further asserted that although Ms. Dudley initially responded that she could not consider the death penalty and was later rehabilitated, her equivocation was justification for a peremptory challenge. The circuit court then denied Anderson's challenge and concluded that there was no pattern of discrimination. The court noted that the State had

previously provided race- and gender-neutral explanations, and that of the jurors selected, there were six women and one man. The court further observed that the State was only required to give a gender-neutral explanation out of an abundance of caution. Once again, we agree with the circuit court. We affirm the circuit court's findings on all the *Batson* challenges.

### VI. Maurice Anderson and the Prosecutor's Subpoena

Anderson argues that the circuit court erred by allowing the prosecutor to interrogate Maurice Anderson during a break in the trial pursuant to a subpoena. This procedure, according to Justin Anderson, violated his right to be provided exculpatory evidence, namely a note in Maurice's possession which gave directions to the murder weapon. Anderson further contends that the prosecutor's abuse of his subpoena power had the effect of violating Anderson's right to confront and cross-examine a key witness against him — Maurice. Anderson also urges that the trial judge committed reversible error by participating in the State's interrogation of Maurice Anderson. For that reason, he contends, the judge should have recused from the case.

In *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), this court discussed the prosecutor and his subpoena power:

> . . . The prosecutor's subpoena power granted under the statute was passed by the General Assembly to implement the power of prosecutors to bring criminal charges by information. *Cook v. State*, 274 Ark. 244, 623 S.W.2d 820 (1981). It was designed to take the place of questioning by a grand jury. *Kaylor v. Fields*, 661 F.2d 1177 (8th Cir. 1981). The emergency clause to the statute states that it was enacted to enable prosecutors to "properly prepare criminal cases." *Cook v. State*, 274 Ark. at 248, 623 S.W.2d at 822. The prosecutor may use the subpoena power to investigate and prepare for trial as long as the power is not abused. *Todd v. State*, 283 Ark. 492, 678 S.W.2d 345 (1984). However, we will reverse a case in which a prosecutor abuses the subpoena power. *Foster v. State*, 285 Ark. 363, 687 S.W.2d 829 (1985); *Cook v. State*, 274 Ark. at 249, 623 S.W.2d at 823.

326 Ark. at 993, 936 S.W.2d at 549. In *Neal v. State*, 320 Ark. 489, 898 S.W.2d 440 (1995), this court observed that where the appellant has neither alleged nor shown any prejudice resulting from alleged misuse of the prosecutor's subpoena power, this court will not reverse.

We further note that the record fails to reflect any objection by Anderson with respect to the prosecutor's subpoena of his brother.[10] A discussion was held by counsel with the circuit court prior to the execution of the prosecutor's subpoena, as well as following its execution. At no time did Anderson object to the subpoena hearing; nor did he ever claim that exculpatory evidence was withheld; nor did he obtain a ruling on any such argument. This court has made it clear that it is up to the appellant to obtain a clear ruling on an issue in order to preserve that point for appeal. *See Rutledge v. State*, 345 Ark. 243, 45 S.W.3d 825 (2001). Nor do we find this to be the type of alleged error exempt under *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), from our requirement of a contemporaneous objection, especially since the transcript of the subpoena hearing was given to Anderson during the trial and before the defense presented its case.

Anderson also asserts that by being excluded from the State's examination of Maurice Anderson under the prosecutor's subpoena power he was denied his right to confront witnesses against him. We disagree. As an initial matter, Anderson has failed to cite us to any convincing authority for his proposition. This court has held, even in a capital case, that where the party fails to cite to authority or fails to provide convincing argument, we will not consider the merits of the arguments. *See, e.g., Isom v. State, supra.* Furthermore, this court observed in *Echols v. State, supra*, that the prosecutor's subpoena power was designed to take the place of questioning by a grand jury and was enacted to enable prosecutors to prepare criminal cases properly through investigation prefatory to trial. In the instant case, it is clear that the prosecutor was trying

---

[10] Anderson did move for a mistrial and moved for the trial court to recuse, *after* the subpoena hearing was held on the basis that the court and court reporter were involved in the matter and defense counsel were not present. However, at no time did Anderson's defense counsel mention any possible *Brady* violation, nor challenge the prosecutor's actual right to subpoena. In fact, defense counsel stated its understanding that the prosecutor had a right to the subpoena:

> MR. MARCZUK: ...I know on Friday Mr. Haltom had his right to go ahead and do a prosecutorial subpoena, which he did, and our question was is the fact that he managed to get the court and our court reporter to get involved in the matter, and because of that, it just gives the appearance of impropriety....

to prepare his case while dealing with an uncooperative witness. The sole reason that the interview was done before the circuit court was because the witness, Maurice Anderson, refused to be interviewed otherwise. Without question, when a prosecutor ordinarily interviews a potential witness in a criminal case, the defendant has no right to be present. We find no abuse of discretion on the part of the circuit court.

Anderson also asserts that because the circuit judge participated in the prosecutor's execution of the Maurice Anderson subpoena and in the resulting interrogation, he erred in denying Anderson's motion for his recusal from the case and his motion for mistrial. Again, Anderson has failed to cite us to any authority for the proposition that where a circuit judge swears in a prosecutor's witness following a prosecutor's subpoena that judge is required to recuse.

But, in addition, this court uses the following standard to review the denial of a motion to recuse:

> . . . The decision to recuse is within the trial court's discretion, and it will not be reversed absent abuse. *Ayers, supra*; *Kail v. State*, 341 Ark. 89, 14 S.W.3d 878 (2000); *Gates v. State*, 338 Ark. 530, 2 S.W.3d 40 (1999). An abuse of discretion can be proved by a showing of bias or prejudice on the part of the trial court, and the burden is on the party seeking to disqualify. To decide whether there has been an abuse of discretion, we review the record to see if prejudice or bias was exhibited. *Black v. Van Steenwyk*, 333 Ark. 629, 970 S.W.2d 280 (1998); *Dolphin v. Wilson*, 328 Ark. 1, 942 S.W.2d 815 (1997); *Reel, supra.*
>
> A trial judge's development of opinions, biases, or prejudices during a trial do not make the trial judge so biased as to require that he or she recuse from further proceedings in the case. *Noland v. Noland*, 326 Ark. 617, 932 S.W.2d 341 (1996); *Allen v. Kizer*, 294 Ark. 1, 740 S.W.2d 137 (1987). Absent some objective demonstration by the appellant of the trial judge's prejudice, it is the communication of bias by the trial judge which will cause us to reverse his or her refusal to recuse. *Noland, supra*; *Matthews v. Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (1983). The mere fact of adverse rulings is not enough to demonstrate bias. *Gates v. State*, 338 Ark. 530, 2 S.W.3d 40 (1999). Whether a judge has become biased to the point that he should disqualify himself is a matter to be confined to the conscience of the judge. *Matthews, supra*; *Walker v. State*, 241 Ark. 300, 408 S.W.2d 905

(1966); *Narisi v. Narisi*, 229 Ark. 1059, 320 S.W.2d 757 (1959). The reason is that bias is a subjective matter peculiarly within the knowledge of the trial judge. *Id.*

*Irvin v. State*, 345 Ark. 541, 549-50, 49 S.W.3d 635, 640-41 (2001).

 Anderson claims that "the obvious appearance of bias resulting from the trial court's participation in the *ex parte* hearing dictates a reversal." However, he fails to cite to any specific showing of bias or prejudice on the circuit court's behalf. Consequently, he has failed to demonstrate why this court should reverse the denial of his motion to recuse. Nor has he done so with respect to his motion for mistrial.

 This court has held that a circuit court has wide latitude in its discretion to grant or deny a mistrial, and it will not be reversed absent an abuse of that discretion. *See Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000). Nor will this court reverse a mistrial decision in the absence of a showing of manifest prejudice. *See id.* Because Anderson has failed to point to any manifest prejudice as a result of the court's oversight of the prosecutor's interview of Maurice Anderson, we cannot say that the circuit court erred in denying either motion.

### VII. Improper Remarks

Anderson urges for his next point that the circuit court should have declared a mistrial, *sua sponte*, after the prosecutor made comments regarding (1) Anderson's relationship with his grandmother, and (2) Jeannie Magee's relationship to Anderson as his probation officer. He claims that the prosecutor's statements regarding his relationship with his grandmother were made to draw attention to the fact that Anderson did not testify on his own behalf, in violation of his Fifth Amendment right against self-incrimination. He further asserts that the prosecutor's comments about Magee being Anderson's probation officer were improper because (1) the circuit court had granted Anderson's motion in limine to exclude such statements, and (2) the comments regarding Magee's actions towards Anderson were not part of the trial record. Thus, he contends, the comments were calculated to arouse the passions and anger of the jury to obtain a death verdict. He also maintains that a mistrial should have been granted when the prosecutor made comments during the sentencing closing argument which were calculated to diminish the jury's sense of responsibility for imposing the death penalty.

Anderson first takes issue with the following statement made by the prosecutor during his closing argument at the sentencing phase with regard to mitigation:

> . . . And I ask you to look carefully about how some of these things are worded. You know, just like the next one. Justin Anderson has a loving relationship with his grandmother, Susie. Well, if that was to have read Susie Anderson loves Justin Anderson, we had some proof of that, but did we have any proof of it the other way? Cause she told us she loved him, and I believed her, but did we have it the way they've got it worded. That's what I'm saying. It's just kind of some legalize lawyer stuff . . . .

Anderson concedes that he did not object to the prosecutor's statement but claims that the court should have, *sua sponte*, declared a mistrial. Nonetheless, we conclude that this issue regarding self-incrimination falls within the third exception in *Wicks v. State, supra, i.e.*, a serious error invoking the circuit court's duty to intervene, such as during closing argument, to correct the error either by admonition or by ordering a mistrial. *See Isom v. State, supra.*

That being said, this court has previously set forth the following procedure for determining whether an improper comment has been made on a defendant's failure to testify:

> First, we determine whether the comment itself is an improper comment on the defendant's failure to testify. The basic rule is that a prosecutor may not draw attention to the fact of, or comment on, the defendant's failure to testify, because this then makes the defendant testify against himself in violation of the Fifth Amendment. A veiled reference to the defendant's failure to testify is improper, as well. Should we determine that the prosecutor's closing argument statement did indeed refer to [the defendant's] choice not to testify, we would then determine whether it can be shown beyond a reasonable doubt that the error did not influence the verdict.

*Jones v. State*, 340 Ark. 390, 402, 10 S.W.3d 449, 456 (2000).

After conducting this analysis, we conclude that the comment itself was not improper. While it is true that Anderson most definitely could have testified about his love for his grandmother, it is just as likely that another family member, or his

grandmother herself, could have testified about that relationship. In short, there were many avenues for substantiating that relationship, and we cannot conclude that the jury viewed the only "proof" alluded to by the prosecutor as coming from the lips of Anderson. We cannot say that the circuit court erred in failing to declare a mistrial.

Anderson further challenges the court's failure, *sua sponte*, to grant a mistrial based on the prosecutor's argument with regard to Jeannie Magee:

> . . . And one person he chose to abuse a relationship was Jeannie Magee, his probation officer in juvenile court at the time he got committed to the DYS. She gave him opportunities to go to Job Corp, to get in everything. In all programs. . . .

Anderson contends that because the statement was made in violation of the court's order granting his motion in limine to exclude testimony that Magee was his probation officer, and because the comments regarding Magee's acts towards Anderson were not a part of the record before the jury, they too were calculated to arouse the passions and anger of the jury to obtain a verdict of death. Again, Anderson urges that while he failed to object to the comment, it fell within the third *Wicks* exception and the trial court erred in not ordering a mistrial.

We disagree that this situation falls within a *Wicks* exception to our requirement that a contemporaneous objection be made to any perceived error at trial. In *Anderson v. State*, 354 Ark. 102, 118 S.W.3d 574 (2003), this court specifically held that where a motion in limine on an issue had been *granted*, "it was appellant's burden to obtain a ruling on his motion when it appeared that the trial court's previous ruling was being violated; and, because the trial court failed to rule on appellant's objection, appellant's argument is, therefore, procedurally barred."[11] 354 Ark. at 108, 118 S.W.3d at 577. In the instant case, Anderson did not object at all to the prosecutor's statements regarding Ms. Magee. We conclude that the asserted error is not preserved for our review.

---

[11] While *Anderson v. State, supra*, was not a capital case, the third *Wicks* exception does not appear to be limited to only capital cases. The holding in *Anderson* is, therefore, applicable to the instant case.

Finally, Anderson challenges arguments made by the prosecutor in the sentencing phase to which he did make an objection:

> The question of death, and I've thought about it. You know, its unnatural, kind of, in a way, you know, to say, hey, put this guy to death. But he deserves it. And when we think about punishment and how it should be administered, we've got to think about the proof we're required, and the line a person crosses. This defendant chose, with his life style, and now with his actions, that have been proven to you beyond a reasonable doubt, that he's crossed that line. He's on the other side, where the ultimate punishment is the punishment he deserves. He's there. Ain't no doubt about that. He's there, and if y'all find enough mitigators to say, I just can't do it, but he's crossed that line. He's there.

> In all cases involving the death penalty, every one of you have to search your souls. I know it's tough. It's easy up here on me, and I'm asking for the State of Arkansas to give it, but you're the one who has to sign that form. It's the last step in the process. Law enforcement has done their job, the victim's family have done their job, I've tried to do my job to the best of my ability, and there's one more step. Juries, by their verdicts, a death penalty case it's a lot about punishing that person for what he did, but also, by our verdicts we tell society about where this line is.

Following this argument, defense counsel objected on the basis that the State could not advocate sending a societal message about punishment and imposing the death penalty.

 Anderson urges on appeal that the State's argument was improper as it diminished the jury's responsibility. We must disagree. If anything, the State's argument emphasized what a monumental decision it is to impose the death penalty but that that is indeed the jury's role. Anderson relies on the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), for the proposition that arguments which lessen the jury's sense of responsibility are not permissible. In *Coulter v. State*, 304 Ark. 527, 804 S.W.2d 348 (1991), this court observed that the United States Supreme Court's specific concern in *Caldwell* was "with the attempt of a prosecutor to make jurors think that 'others', in that case an appellate court, would ultimately be responsible for the death of the person they were asked to sentence to that fate." 304 Ark. at 538, 804 S.W.2d at 354. We then stated

that in determining the merits of Coulter's claims, we had to examine whether the prosecutor violated "the Supreme Court's admonition against attempting to make the jury less cognizant of the 'gravity of its task' and less aware of its 'truly awesome responsibility.' " *Id.*, 804 S.W.2d at 354. We conclude that the prosecutor's statements in the instant case did not violate the standard set out in *Caldwell*. If anything, the prosecutor's comments magnified the gravity of the jury's task and amplified its responsibility. There was no reversible error under this point.[12]

## *VIII. Diminished Capacity*

Anderson next claims that in light of the fact that a 1996 mental examination demonstrated that he had a full scale IQ of 65, his death sentence must be overturned under *Atkins v. Virginia*, 536 U.S. 304 (2002).

Though the State contends that this issue was not preserved, we disagree. Anderson filed a motion to bar the State from seeking the death penalty under Ark. Code Ann. § 5-4-618 (Repl. 1997), on March 23, 2001, well before the United States Supreme Court handed down *Atkins* on June 20, 2002. In that motion, Anderson urged that because he was mentally-retarded, the State was barred from seeking the death penalty against him. This is sufficient, in our judgment, to preserve the issue for our review.

In *Atkins v. Virginia, supra,* the United States Supreme Court took note of the fact that many states, including Arkansas, had enacted statutes prohibiting the execution of mentally-retarded offenders. The Court observed that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317. The Court then specifically said that as was the Court's approach with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* (quoting *Ford v. Wainwright,* 477 U.S. 399, 405, 416-17 (1986)). The Court found that its death penalty jurisprudence provided "two reasons consistent with the legislative consensus that the mentally retarded should be categorically excluded from execu-

---

[12] Anderson asserts in his brief that the trial court also denied his motion for a mistrial on this basis. However, the citations to the record made by Anderson reflect that defense counsel merely objected and did not specifically request a mistrial.

tion." *Id.* at 318. First, the Court noted, "there is a serious question as to whether either justification that we have recognized as a basis for the death penalty applies to mentally retarded offenders." *Id.* at 318-19 (referring to retribution and deterrence as the social purposes served by the death penalty). But also, it said "[t]he reduced capacity of mentally retarded offenders provides a second justification for a categorical rule making such offenders ineligible for the death penalty." *Id.* at 320. The Court concluded that it saw "no reason to disagree with the judgment of 'the legislatures that have recently addressed the matter' and concluded that death is not a suitable punishment for a mentally retarded criminal." *Id.* at 321.

 We believe that the court in *Atkins* merely reaffirmed this State's preexisting prohibition against executing the mentally retarded. Section § 5-4-618(b), which is part of Act 420 of 1993, provides that no defendant with mental retardation at the time of committing capital murder shall be sentenced to death. Thus, it is proper for this court to review Anderson's claims under our statute.

Section 5-4-618(a)(2) establishes a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five or below. *See* Ark. Code Ann. § 5-4-618(a)(2) (Repl. 1997). It specifically places the burden on the defendant to prove mental retardation at the time of committing the offense by a preponderance of the evidence. *See* Ark. Code Ann. § 5-4-618(c). The statute then sets forth the procedure by which a defendant charged with capital murder shall raise the special sentencing provision of mental retardation.

In the instant case, Anderson filed the required motion as directed by the statute. *See* Ark. Code Ann. § 5-4-618(d) (Repl. 1997). In support of his motion, Anderson submitted a 1996 evaluation performed by Dr. Paul Deyoub, a clinical psychologist.[13] Dr. Deyoub's evaluation noted that at the time of the evaluation, Anderson was a fifteen-year-old male committed to the Youth Services Center for burglary, a felony, and theft of property, a misdemeanor. After performing the Wechsler Intelligence Scale for Children — Third Edition, Dr. Deyoub concluded that Anderson's "Full Scale IQ of 65 is in the Mild range of Mental

---

[13] The transcript of arguments made on the motion refer to Dr. Deyoub as "Dr. Paul Daoud." The correct spelling is Dr. Deyoub.

Retardation. All of the scores were well below average. He was cooperative for the testing and seemed to try his best, but his scores were very low." After completing the Wide Range Achievement Test — Third Revision, Dr. Deyoub commented that Anderson's "scores indicate much better academic ability than would be expected for someone with a 65 IQ. . . . The WRAT-3 scores either cast doubt on the 65 IQ or suggest that even though he has such a low IQ, he has been able to acquire basic literacy ability. Nevertheless, his adaptive ability seems to be much better than the 65 IQ suggests." Dr. Deyoub then made the following conclusions in his evaluation:

> In spite of mental retardation, Justin has been able to acquire academic ability between 6th and 8th grade ability. These are very good academic scores considering his 65 IQ. His adaptive ability is also better than his mild mental retardation would suggest. . . . Even though he has a 65 IQ, it is possible that he could pass the GED, though this will require fairly extensive adult education. He is still only 15 and not ready to take the GED in any case, so he ought to be required to attend school for 1 to 2 additional years. His test results indicate fairly chronic delinquency. The antisocial scales, combined with low intellectual ability, predispose him to acting out illegally. Even though he has pretty good academic scores, th[e] 65 IQ will affect overall judgment and insight.

At the hearing on Anderson's § 5-4-618(d) motion, the State urged that whether or not he was mentally retarded was a fact question to be determined by the jury. The State later submitted an evaluation completed by Dr. Charles Mallory after an examination on September 12, 2001, pursuant to the court's order of February 5, 2001, for a mental evaluation. In that evaluation, Dr. Mallory commented:

> [Anderson] was also administered the Kent Test, a ten-question measure that attempts to provide an estimate of a person's fund of knowledge. Individuals with a significantly low score on this measure (less than 18 out of a possible 36 points) have a higher incidence of mental retardation, suggesting the need for additional intelligence testing. Justin scored 23 out of 36 possible points on this measure, suggesting that additional intellectual testing was unnecessary. I found that Dr. Deyoub had given him [an] intellectual assessment in July 1996 and had obtained scores indicative of mild mental retardation (WISC-III Full Scale IQ of 65). I also found, however, that Dr. Deyoub found Justin had achievement scores consistent with

average intelligence (WRAT-III standard scores of 87 in reading, 97 in spelling, and 89 in arithmetic, which would argue against his classification in the category of mental retardation. Consistent with the earlier WRAT-III scores, I found his current reading performance on that scale to be on the high school level (standard score 88, at the 21st percentile of his agemates). Based on his performance during the present examination I would estimate his general intellectual ability to fall in the IQ range of 80 to 90 and that he did not put forth his best effort in the WISC-III testing session with Dr. Deyoub.

After hearing arguments of counsel, the circuit court ruled:

All right. Reading from Dr. [Deyoub]'s report some five and a half years ago, the W.R.A.T. 3 scores either cast doubt on the sixty-five I.Q., or suggest that even though he has such a low I.Q., he has been able to acquire basic literacy ability. Nevertheless, his adaptive ability seems to be much better than the sixty-five I.Q. suggests. He is able to read and write close to the average level. Referring to the court ordered examination performed at the state hospital by Dr. Mallory, finding Mr. Anderson both competent and capable to conform his conduct. The motion is denied.

■■■ This court has held that a circuit court's finding that a defendant is not mentally retarded under § 5-4-618 will be affirmed if it is supported by substantial evidence. *See Rankin v. State*, 329 Ark. 379, 948 S.W.2d 397 (1997). In the case at hand, the circuit court's determination that Anderson was not mentally retarded at the time of Ms. Creech's murder is supported by substantial evidence. Section 5-4-618 clearly provides that no defendant with mental retardation *at the time of committing* capital murder shall be sentenced to death. The statute specifically places the burden·upon the defendant to prove mental retardation *at the time of committing* the offense by a preponderance of the evidence. Here, instead of submitting evidence demonstrating mental retardation at the time of the offense, which took place on October 12, 2000, Anderson submitted evidence of his IQ from 1996.

■■ There is also the point that the State rebutted the presumption that Anderson was mentally retarded. Although Anderson takes issue with Dr. Mallory's methods of assessment, the State nonetheless rebutted the presumption of mental retardation with Mallory's report which found an IQ somewhere in the range of 80-90. Although the respective experts did not testify

before the court on the motion, the circuit court was certainly able to review both evaluations in making its conclusions. Accordingly, we conclude that the circuit court did not err in denying Anderson's motion.

██ ██ Because the circuit court determined that Anderson was not mentally retarded, he was permitted to raise the question of mental retardation to the jury for determination *de novo* during the sentencing phase of the trial, pursuant to Ark. Code Ann. § 5-4-618(d)(2)(A). Although it is unclear from his brief to what extent Anderson's arguments take issue with the jury's failure to find him mentally retarded, we affirm the jury's decision. Where in the past, an appellant challenged the jury's conclusion, on the basis that the jury impermissibly ignored his mitigation evidence that he suffered a mental dysfunction, this court said:

> It has consistently been held . . . that a jury is not bound to accept opinion testimony of experts as conclusive, and it is not compelled to believe their testimony any more than the testimony of other witnesses. Even when several competent experts concur in their opinions, and no opposing expert evidence is offered, the jury is bound to decide the issue upon its own judgment. Testimony by expert witnesses is to be considered by the jury in the same manner as other testimony and in light of other testimony and circumstances in the case. The jury alone determines what weight to give the evidence, and may reject it or accept all or any part of it it believes to be true. *Robertson v. State*, 304 Ark. 332, 802 S.W.2d 920 (1991); *Gruzen v. State*, 267 Ark. 380, 591 S.W.2d 342 (1979).

*Williams v. State*, 347 Ark. 728, 751, 67 S.W.3d 548, 562 (2002). *See also Davasher v. State*, 308 Ark. 154, 823 S.W.2d 863 (1992). The Anderson jury was not bound by the opinion evidence offered and was free to accept or reject it. We affirm both the circuit court's and the jury's decision of no diminished capacity.

### IX. Mitigation

Anderson urges that the jury erred in marking section D of Form 2, indicating that no evidence of mitigation was offered, where evidence was clearly presented and sometimes not even rebutted by the State. He contends that the jury arbitrarily disregarded the proof and refused to acknowledge his mitigation evidence. Anderson argues, in addition, that the jury was clearly

confused with regard to mitigating evidence as evidenced by its failure to complete Form 2 correctly.[14]

Form 2 gave the jury four options:

A. ( ) We unanimously find that the following mitigating circumstance(s) probably existed:

. . . .

B. ( ) One or more members of the jury believed that the following mitigating circumstance(s) probably existed, but the jury did not unanimously agree that such mitigating circumstance(s) probably existed:

. . . .

C. ( ) There was some evidence presented to support the following circumstance(s). However, having considered this evidence, the jury unanimously agreed it was insufficient to establish that the mitigating circumstance(s) probably existed:

(If any circumstances are checked in this section, you should not complete Section D. Any factor or factors checked in this section should not be checked again in any other section.)

. . . .

D. ( ) No evidence of a mitigating circumstance was presented by either party during any portion of the trial. (Check only if no evidence of a mitigating circumstance was presented).

The Anderson jury marked section D.

We agree that the jury's decision to check Form 2 D was clearly in error. There was unrebutted evidence offered in mitigation by Anderson regarding the fact that he grew up in an

---

[14] Anderson's brief refers to the form at issue as Form 3. However, Form 2 is entitled Mitigating Circumstances, while Form 3 is entitled Conclusions. Form 3 contains no section D.

abusive family, that his mother was mentally retarded, and that he was separated from his family and sent to a foster home at an early age. While the evidence may not have *established* that a mitigating circumstance "probably existed" for the murder, it was certainly *presented* for that purpose. What the jury should have checked, if it did not believe the evidence presented rose to the level of mitigating evidence, is Form 2 C: "C. ( ) There was some evidence presented to support the following circumstance(s). However, having considered this evidence, the jury unanimously agreed it was insufficient to establish that the mitigating circumstance(s) probably existed[.]" The jurors did not check Form 2 C; nor did they mark any of the proposed mitigators to show that some evidence was offered to support them.

The question for this court to resolve is whether this mistake on Form 2 is overcome by the weighing process in Form 3. On Form 3, the jury checked paragraphs (a), (b), and (c), which provide:

WE THE JURY CONCLUDE:

(a) (√) The State proved beyond a reasonable doubt one or more aggravating circumstances.

(If you do not unanimously agree to check paragraph (a), then skip (b) and (c) and sentence Justin Anderson to life imprisonment without parole on Form 4.)

(b) (√) The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found by any juror to exist.

(If you do not unanimously agree to check paragraph (b), then skip (c) and sentence Justin Anderson to life imprisonment without parole on Form 4.)

(c) (√) The aggravating circumstances when weighed against any mitigating circumstances justify beyond a reasonable doubt a sentence of death.

(If any circumstances are checked in this section, you should not complete section D. Any factor or factors checked in this section should not be checked again in any other section.)

Paragraphs (b) and (c) provide the bases for weighing, assuming any juror found any mitigating circumstances to exist.

Here, the jury did not get that far in the sentencing process as it found no evidence of mitigators was even presented.

We note, initially, that defense counsel did not object to the jury's erroneous completion of Form 2; nor did the circuit court insinuate itself into the matter and note any problem with Form 2. Despite no objection, we conclude that the erroneous completion of the sentencing forms in a death case involves a matter essential to the consideration of the death penalty, which is an exception to our plain-error rule under *Wicks v. State, supra.* We will, therefore, address the merits of the issue. *See, e.g., Camargo v. State,* 327 Ark. 631, 940 S.W.2d 464 (1997); *Bowen v. State,* 322 Ark. 483, 911 S.W.2d 555 (1995).

In turning to the merits, this court has held that a jury cannot ignore a stipulated mitigating factor. *See Anderson v. State,* 353 Ark. 384, 108 S.W.3d 592 (2003). In *Anderson,* section D on Form 2 was omitted from the form, but the jury checked no boxes on Form 2 for mitigators. A mitigating factor of no previous criminal history was undisputed and, indeed, had been stipulated to by the parties. We said:

> ... There is no written proof that the jury considered any mitigating circumstances. Section 5-4-603 requires "written findings" that "[a]ggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist." Without a signed and filed Form 2, this court is unable to say that the jury considered any possible mitigating circumstances, much less that it concluded beyond a reasonable doubt that the only aggravating circumstance outweighed any mitigating circumstances found to exist. Accordingly, we reverse and remand for resentencing.

353 Ark. at 410-11, 108 S.W.3d at 609.

What concerns this court in the case at hand is the confusion on the part of the jury which apparently led the jury members to disregard *any* consideration of mitigating circumstances. Where confusion is evident regarding mitigating circumstances, the Pennsylvania Supreme Court recently sent a death case back for resentencing. *See Commonwealth v. Chambers,* 570 Pa. 3, 807 A.2d 872 (2002) (confusion resulted since jury could have believed, based on the instruction, that all members of the jury had to find a mitigating circumstance before weighing against the aggravators could begin). As the Pennsylvania Supreme Court said in *Cham-*

*bers,* "This possible and reasonable confusion could have meant the difference between life imprisonment and a sentence of death, rendering the sentence fundamentally unreliable." 570 Pa. at 22, 807 A.2d at 883.

■ The jurors' confusion in the instant case is further evidenced by their request to the circuit judge for a definition of mitigating circumstances. The judge responded that there is no definition, and that "mitigating circumstances" means what a reasonable person believes it means. The jury then marked section D of Form 2, stating that there was no mitigating evidence presented. The Note on Use to Form 2 in our Model Criminal Instructions refers specifically to section D and states that it should be used *only* when neither the State nor the defendant has introduced any mitigating evidence at any point during the trial. *See* AMI Crim. 2d 1008, Form 2. That was not the situation in the instant case. Without proof that the jury at least considered and examined the mitigating evidence presented, an essential and fundamental step in the weighing process was not taken, and the death sentence became automatic.

We are mindful that the State contends that the jury's marking of Form 2 D is harmless error, because the jury found that the aggravator outweighed any mitigators in Form 3. What the State's analysis presupposes, however, is that the jury considered the mitigating evidence. By checking Form 2 D, the jury said it did not. Thus, what this court must resolve is whether the jury's disregard of all evidence presented of mitigating circumstances, which has the effect of an automatic death sentence in light of the sole aggravator, can be harmless error. We recently found harmless error to exist in *Robbins v. State*, 356 Ark. 225, 149 S.W.3d 871 (2004). The *Robbins* case, though, is altogether different. In *Robbins*, a jury white-out on Form 2 left some doubt as to whether the jury found a mitigating circumstance of no significant criminal history, or, alternatively, found that there was evidence presented of that circumstance but that it did not amount to a mitigator. We held that in either case, weighing the evidence of no significant criminal history against the aggravator of cruel or depraved perpetration in Form 3 cured any problem. Additionally, in *Robbins*, the jury members were polled on whether they had found the mitigator of no significant criminal history. Indeed, the judge read that finding of mitigation to the jury and all jurors nodded their heads that they had made such a finding. Because of that, we concluded: "If there was any doubt as to what the jurors intended

to mark on Form 2, that doubt was resolved by the jury's answers to the trial court." *Robbins*, 356 Ark. at 234, 149 S.W.3d at 876.

In the instant case, no polling of the jury regarding any mitigating circumstance took place, and the jury manifestly erred by marking the box that there was no evidence presented of any mitigators, in light of the fact that an abundance of such evidence was, in fact, presented.[15] Based on Form 2 D, we can only conclude that the jury eliminated from its consideration all evidence presented of mitigating circumstances and sentenced Anderson to death solely based on the aggravating circumstance. This, we conclude, was reversible error.[16]

The record of the guilt phase in this case has been reviewed for any prejudicial error under Ark. Sup. Ct. R. 4-3(h), Ark. Code Ann. § 16-91-113(a) (1987), and Ark. R. App. P.—Crim. 10, and none has been found.

Accordingly, we affirm the judgment of conviction for capital murder, but we reverse the death sentence and remand for resentencing.

Affirmed in part. Reversed and remanded in part.

---

[15] The jurors in the instant case were only polled generally on whether his or her verdict was a death sentence.

[16] We take this opportunity to urge the circuit courts, prosecutors, and defense counsel to refer to the Note on Use for Form 2 with respect to when the form should be modified to exclude section D. We further urge the Criminal Instructions Committee to consider whether section D should be eliminated altogether, or whether the Note on Use should be revised to specifically delineate those instances in which section D's use would be appropriate.