Michael Wayne HINKSTON *v.* STATE of Arkansas

CR 99-565 10 S.W.3d 906

Supreme Court of Arkansas
Opinion delivered March 2, 2000

*Robert C. Marquette,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Kelly S. Terry,* Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Michael Hinkston was convicted of capital murder and theft of property and sentenced to life imprisonment without parole and twenty years' imprisonment, respectively. He raises four points for reversal. We find no error and affirm.

Mr. Hinkston's conviction arose out of certain events that occurred on June 24, 1997. At trial and in a custodial statement given to police, Mr. Hinkston claimed he went with Tony Ray to the home of the victim, Lisa Lewis, because Mr. Ray had told him that Ms. Lewis was his aunt and that she had given him permission to borrow her car. Once they arrived at the victim's home, Mr. Ray broke into the house while Mr. Hinkston waited in some nearby woods. Mr. Hinkston subsequently joined Mr. Ray inside the house, and the two men stayed there until Ms. Lewis returned home several hours later. Mr. Hinkston testified that shortly after

the victim entered the house, Mr. Ray forced him to hold her at gunpoint in the back bedroom. Mr. Ray then told him to leave the bedroom and go to the living room. According to Mr. Hinkston, he was in the living room "staring at the wall," when he heard screaming and begging coming from the back bedroom, followed by three shots. Soon afterward, Mr. Ray came running out of the bedroom, assured Mr. Hinkston that he had not shot Ms. Lewis, and both men fled from the scene in Ms. Lewis's car. Meanwhile, Ms. Lewis managed to place a 911 call and told the dispatcher that she had been shot. Van Buren police officers and paramedics responded to the call and, upon arriving at the scene, found Ms. Lewis in the living room dying of gunshot wounds. She told a police officer that two white men had shot her. As a result of the 911 call, Mr. Hinkston and Mr. Ray were apprehended and arrested within a short time after they left the scene. Ms. Lewis was transported to the hospital where she died later that same day. An autopsy revealed that Ms. Lewis died of gunshot wounds to the hand, neck, and abdomen.

## I. Admissibility of Expert Testimony

For his first point on appeal, Mr. Hinkston argues that the trial court erred when it granted the State's motion in limine to exclude the testimony of Dr. Patricia Walz, a clinical psychologist who examined Mr. Hinkston prior to the trial. Mr. Hinkston asserts that the trial court's ruling violated his right under the Sixth Amendment to the United States Constitution and the Arkansas Constitution to call witnesses on his behalf at trial. We have reiterated many times that arguments not raised at trial will not be addressed for the first time on appeal. *Harris v. State*, 320 Ark. 677, 899 S.W.2d 459 (1995). Furthermore, parties cannot change the grounds for an objection on appeal, but are bound on appeal by the scope and nature of their objections as presented at trial. *Id.* At trial, Mr. Hinkston never made an argument that the exclusion of Dr. Walz's testimony would violate any of his constitutional rights, much less his constitutional right under the Sixth Amendment and the Arkansas Constitution to call witnesses on his behalf. We do not consider arguments, even constitutional ones, raised for the first time on appeal. *Moore v. State*, 323 Ark. 529, 915 S.W.2d 284 (1996); *Martin v. State*, 316 Ark. 715, 875 S.W.2d 81 (1994); *Hamm v. State*, 301 Ark. 154, 782 S.W.2d 577 (1990). Because Mr. Hink-

ston's Sixth Amendment argument is not preserved for appellate review, we are precluded from addressing that issue on appeal.

Mr. Hinkston also makes a nonconstitutional argument that the exclusion of Dr. Walz's testimony violated the rules of evidence. That argument was raised below and is, therefore, preserved for appellate review. Specifically, Mr. Hinkston contends that this court's decision in *Stewart v. State*, 316 Ark. 153, 870 S.W.2d 752 (1994), does not prevent an expert, such as Dr. Walz, from giving testimony concerning a defendant's inability to conform his conduct to the requirements of the law due to mental disease or defect or from giving an explanation of the defendant's mental disease or defect and how it affected his statement to law enforcement officers.

In *Stewart v. State*, we held that expert testimony on the ability of a defendant to form specific intent to murder is not admissible. *Stewart v. State, supra*. In so holding, we drew a distinction between psychiatric testimony concerning whether a defendant has the ability to conform his conduct to the requirements of law at the time of the killing as part of an insanity defense and testimony on whether the defendant had or did not have the required specific intent to commit murder at a precise time:

> A general inability to conform one's conduct to the requirements of the law due to mental defect or illness is the gauge for insanity. It is different from whether the defendant had the specific intent to kill another individual at a particular time. Whether Stewart was insane certainly is a matter for expert opinion. Whether he had the required intent to murder Ragland at that particular time was for the jury to decide.... While expert testimony on whether a defendant lacked the capacity to form intent is probative, we question whether opinion evidence on whether the defendant actually formed the necessary intent at the time of the murder is.

*State v. Stewart*, 316 Ark at 159, 870 S.W.2d at 755. (Citations omitted.) We reiterated again in *DeGracia v. State*, 321 Ark. 530, 906 S.W.2d 278 (1995), that:

> The basis of our holding [in *Stewart v. State*] was that Rule 704 requires that expert opinion of the sort that "embraces an ultimate issue" must be "otherwise admissible." To be otherwise admissible the evidence, according to Ark. R. Evid. 403, must be helpful to the jury and not tend to be confusing. We said in the *Stewart* case

that the testimony in question was potentially misleading and confusing to the jury.

*Id*. at 532, 906 S.W.2d at 279.

■ In this case, Mr. Hinkston conceded at trial that he was not asserting the insanity defense. In light of his decision not to raise that defense, any testimony that Dr. Walz could have given about Mr. Hinkston's inability to conform his conduct to the requirements of the law because of mental disease or defect was not relevant. *See* Ark. R. Evid. 402 (1999); *Daniels v. State*, 277 Ark. 23, 638 S.W.2d 676 (1982).

■ Likewise, there is no merit to Mr. Hinkston's contention that Dr. Walz's testimony was admissible to explain the inconsistencies in his statement to police officers. Mr. Hinkston testified at trial in his own defense. The State then cross-examined him extensively concerning inconsistencies in his statement to police officers. Mr. Hinkston's attorney sought to bolster his client's credibility by attempting to call Dr. Walz as a witness to show that the inconsistencies were attributable to Mr. Hinkston's mental deficits. Where the introduction of expert testimony would invade the function of the jury or where it does not help the jury, it is not admissible. *Utley v. State*, 308 Ark. 622, 826 S.W.2d 268 (1992). One of the functions of the jury is to determine the credibility of witnesses. *Johninson v. State*, 317 Ark. 431, 878 S.W.2d 727 (1994). Expert testimony on the credibility of witnesses is an invasion of the jury's province. *Id*. The trial court properly found that Dr. Walz's testimony would have invaded the province of the jury.

■ The standard of review for a trial court's ruling on the admissibility of expert testimony is abuse of discretion. *Utley v. State, supra*. In light of the purposes for which Mr. Hinkston offered Dr. Walz's testimony, we conclude that the trial court did not abuse its discretion when it granted the State's motion in limine to exclude the expert testimony. We affirm the trial court's ruling on this point.

## II. Discovery Violation

For his second point on appeal Mr. Hinkston contends that the trial court erred in when it denied his motion to strike the testi-

mony of Officer Perry or, alternatively, when it overruled his motion for mistrial. On March 17, 1998, Mr. Hinkston filed a motion for discovery and requested that the prosecutor disclose and permit the inspection and copying of "any police reports made in connection with this case that relate to potential testimony of any police officers or other witnesses." The prosecutor filed a response to that motion on August 3, 1998, which stated that he intended to call Officer Daniel Perry of the Van Buren Police Department as a witness, and that he would permit the inspection and copying of any relevant material, including police reports, made in connection with the case.

Officer Perry was the first officer to arrive at the victim's home. He was called by the State to testify at trial about his investigation at the crime scene. During his testimony, Officer Perry referred to a police report that he had written on the day of the crime. Following an inquiry by Mr. Hinkston's attorney about the nature of the document, the trial court ruled that it would allow the witness to use the report to refresh his memory. Officer Perry proceeded to testify that the victim was still alive when he found her at the crime scene and that she told him that two white men had shot her. Mr. Hinkston's attorney immediately interposed a hearsay objection that was promptly overruled by the trial court based upon the excited utterance exception to the hearsay rule. During cross-examination, Mr. Hinkston's attorney asked to see Officer Perry's report and questioned him about it and the victim's statement. Following Officer Perry's testimony, two other witnesses, Brian Perez and Mark Spellman, testified on behalf of the State. Just as the State was about to call its next witness, George Cabinass, Mr. Hinkston's attorney claimed for the first time that the State had failed to provide a copy of Officer Perry's police report to the defense in its response to the defendant's discovery motion. Based on that claim, defense counsel requested that Officer Perry's testimony be stricken because the defense had no idea that the officer would testify about the victim telling him that two people shot her. Defense counsel further alleged that the State had committed prosecutorial misconduct by failing to provide the police report during discovery. The trial court denied the defendant's motion to strike Officer Perry's testimony. Later, following Mr. Cabinass's testimony, Mr. Hinkston's attorney made a motion for mistrial based on the State's failure to provide Officer Perry's police

report, which motion was also denied by the trial court. Finally, Mr. Hinkston's attorney renewed the motion to strike Officer Perry's testimony at the conclusion of the State's case-in-chief, and the trial court once again denied the motion.

On appeal, Mr. Hinkston asserts that the trial court erred when it denied his motion to strike Officer Perry's testimony and his motion for mistrial. A party who does not object to the introduction of evidence at the first opportunity waives such an argument on appeal. *Marts v. State*, 322 Ark. 628, 968 S.W.2d 41 (1998). Similarly, objections to discovery violations must be made at the first opportunity in order to preserve them for appeal. *Id*. In *Clark v. State*, 323 Ark. 211, 913 S.W.2d 297 (1996), the appellant argued that a witness should not have been allowed to testify because the State failed to include her name on its witness list, in violation of its discovery obligations. The appellant, however, did not object to the testimony until the witness had already taken the stand and answered twenty-four questions. *Id*. We held that the issue was not preserved for appellate review because the appellant did not object at the earliest opportunity. *Id*. During Officer Perry's testimony, Mr. Hinkston's counsel objected solely on the basis of hearsay. At no time during the officer's testimony did defense counsel assert that a discovery violation had occurred. In fact, defense counsel did not object to Officer Perry's testimony on the basis of an alleged discovery violation until after Officer Perry had left the stand and two other witnesses had testified. The motion for mistrial was made even later, after yet a third witness had testified. On this record, we are constrained to conclude that Mr. Hinkston's objection to the alleged discovery violation is not preserved for appellate review because it was not made at the first opportunity.

### III. Batson Challenge

For his third point on appeal, Mr. Hinkston argues that the trial court erred in allowing the State to use a peremptory challenge to strike the only African-American member of the jury panel in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). We have delineated a three-step process to be used in the case of *Batson* challenges. *MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998). First, the strike's opponent must present facts to raise an inference of purposeful discrimination; that is, the opponent must

present a *prima facie* case of racial discrimination. *Id.* Second, once the strike's opponent has made a *prima facie* case, the burden shifts to the proponent of the strike to present a race-neutral explanation for the strike. *Id.* If a race-neutral explanation is given, the inquiry proceeds to the third step, wherein the trial court must decide whether the strike's opponent has proven purposeful discrimination. *Id.* Here, the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent. *Id.*

During *voir dire*, the State exercised a peremptory strike against Patrick Releford, the only African-American member on the jury panel, and Mr. Hinkston challenged the use of the strike. After the challenge was made, the trial judge asked the proponent of the strike for a race-neutral explanation, and the prosecutor gave the following explanation:

> Your Honor, I have personal knowledge of that potential juror from about five years ago, an experience with him with possibility of methamphetamine problems.... And I also talked with Alan Calard, and he's also aware of the problems and also officers of the Van Buren Police Office are aware of the problems with the potential methamphetamine with that potential juror.... No formal charges were ever filed against him. He's been looked into, he's been ... a potential suspect and investigated.... That's why he was excluded, Your Honor.

The trial judge then stated that he thought that was a "good reason" and denied Mr. Hinkston's challenge to the strike. At the end of *voir dire*, Mr. Hinkston renewed his *Batson* challenge, and the trial judge responded that he had already ruled on the issue and he believed that "the State has a good cause for striking him other than race, and that's why the Court is overruling your motion."

██ ██ We will reverse a trial court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999). Also, we accord some measure of deference to the trial court in that it is in a superior position to make these determinations because it has the opportunity to observe the parties and determine their credibility. *Id.* After Mr. Hinkston made his *prima facie* case of discrimination, the prosecutor explained his reason for the strike, indicating that Mr. Releford had been struck because he

had been investigated for problems with methamphetamine. In light of the United States Supreme Court's decision in *Purkett v. Elem*, 514 U.S. 765 (1995), we have held that the State's explanation must be more than a mere denial of racial discrimination, but need not be persuasive or even plausible, and, indeed, may even be silly or superstitious. *MacKintrush v. State, supra.* We have previously concluded that explanations similar to those given here were racially neutral. For example, in *Jackson v. State*, 330 Ark. 126, 954 S.W.2d 894 (1997), we held that the State had provided a race-neutral explanation for striking two jurors, one of whom had been in the prosecutor's office "in connection with serious crimes" and had an ex-husband who had been charged with past crimes by the same prosecutor. Similar explanations have been upheld as being race neutral by the federal courts. *See United States v. James*, 113 F.3d 721 (7th Cir. 1997) (finding peremptory strikes to be racially neutral based on information that potential jurors had relatives who had been involved with drugs); *United States v. Johnson*, 54 F.3d 1150 (4th Cir. 1997) (holding the peremptory strike to be racially neutral based on the fact that the potential juror's husband had been involved in criminal activity); *United States v. Lewis*, 40 F.3d 1325 (1st Cir. 1994) (upholding as race neutral a peremptory strike based on the fact that the potential juror's employer was under investigation by the federal government for possible firearms offenses). Thus, the reasons articulated by the State for exercising a peremptory challenge against Mr. Releford were racially neutral.

 After the prosecutor gave his reason for striking Mr. Releford, Mr. Hinkston offered no evidence or argument to rebut the prosecutor's explanation. "If the strike's opponent chooses to present no additional argument or proof but simply to rely on the *prima facie* case presented, then the trial court has no alternative but to make its decision based on what has been presented to it, including an assessment of credibility." *MacKintrush v. State* 334 Ark. at 399, 978 S.W.2d at 297. After *voir dire* ended and the trial judge had already issued his ruling, Mr. Hinkston finally came forward with an argument that the State's expressed reason for the strike was not genuine because the only African-American member of the jury panel was struck before the State even asked him any questions. He cites no authority for the proposition that the challenged juror must furnish the information on which a party bases a strike. We have previously held to the contrary: "[I]t is accepted practice for the

prosecution as well as the defense to undertake a pretrial investigation of prospective jurors." *Jackson v. State,* 330 Ark. at 130, 954 S.W.2d at 896. Based on this record, we cannot say that the trial court's ruling on the *Batson* challenge was against the preponderance of the evidence.

## IV. Custodial Statements

For his final point on appeal, Mr. Hinkston argues that the trial court erred when it allowed Deputy Glenda Westover to testify for the State regarding statements made by Mr. Hinkston while he was in custody. At trial, Deputy Westover testified that she worked at the Crawford County Detention Center where Mr. Hinkston was incarcerated prior to trial. She testified that one her duties was to monitor prisoners' activities for security. She accomplished that task by visually checking the cells every hour and by listening to a monitor that allowed her to hear the sounds in the cell blocks. Deputy Westover became familiar with and recognized Mr. Hinkston's voice because he did a lot of talking. She testified that she overheard Mr. Hinkston say "that he had shot her, that they didn't have as much fun as they had intended to have..." and he "[t]alked of plans that he had of doing this again."[1]

On appeal, Mr. Hinkston raises three separate challenges to the admission of Deputy Westover's testimony. First, he argues that his Fourth Amendment rights were violated when Deputy Westover listened to his jail cell conversations by means of an electronic monitor. Mr. Hinkston's attorney briefly mentioned "electronic eavesdropping" at the pretrial hearing on his motion to suppress the testimony, but did not argue to the trial court, as he does here, that Mr. Hinkston had a reasonable expectation of privacy in his jail cell that was protected by the Fourth Amendment or that the statements overheard by Deputy Westover were inadmissible because they were the result of an illegal search. Arguments not

---

[1] Mr. Hinkston's attorney elicited testimony from Deputy Westover on cross-examination about other statements that Mr. Hinkston had made while in his cell, such as "how he enjoyed killing the bitch," "he was also looking forward to killing again, but next time raping the subject," "[h]ow much fun it was to see her saying the Lord's prayer and shooting her," and how it "[a]ll was over too fast. Would be more fun next time." Under the doctrine of invited error, Mr. Hinkston cannot base a claim of reversible error upon these statements which he himself chose to introduce. *Kaestal v. State,* 274 Ark. 550, 636 S.W.2d 940 (1982).

raised below will not be addressed for the first time on appeal, and parties are bound on appeal by the scope and nature of the objections and arguments they presented below. *State v. Donahue*, 334 Ark. 429, 978 S.W.2d 748 (1998). We are thus precluded from reaching this argument on appeal.

Mr. Hinkston next argues that Deputy Westover's testimony regarding his jail-cell statements should not have been admitted by the trial court because, under Ark. R. Evid. 403, the statements were so inflammatory that their probative value was substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Ark. R. Evid. 403. Determining the relevancy of evidence and gauging the probative value of that evidence against the danger of unfair prejudice pursuant to Rule 403 is within the trial court's discretion, and we will not reverse the trial court on appeal absent a manifest abuse of that discretion. *McLennan v. State*, 337 Ark. 83, 987 S.W.2d 668 (1999). Mr. Hinkston asserts that the statements he made while incarcerated had only a nominal probative value. We disagree. In fact, those statements were highly probative because they constituted admissions of his involvement in the murder and provided evidence of the circumstances surrounding the crime and his intent to kill the victim. Furthermore, the mere fact that his statements were incriminating does not render them unfairly prejudicial under Rule 403 because "any evidence that tends to establish the guilt of the defendant is inherently prejudicial." *Baker v. State*, 334 Ark. 330, 337, 974 S.W.2d 474, 478 (1998). We conclude, therefore, that the trial court did not abuse its discretion in admitting the testimony under Rule 403.

Finally, Mr. Hinkston claims that the statements should have been excluded under Ark. R. Evid. 901, which governs the authentication and identification of evidence. He contends that the circumstances under which Deputy Westover heard the statements, i.e., that she did not physically see Mr. Hinkston make the statements and that she did not memorialize them immediately,

render the statements' authenticity and integrity suspect. In essence, Mr. Hinkston questions the reliability of Deputy Westover's testimony. In *State v. Sheppard*, 337 Ark. 1, 987 S.W.2d 677 (1999), we held that a witness's competency and capacity for truthfulness in recounting a defendant's statements are matters that may be explored during cross-examination. Here, Deputy Westover was cross-examined fully about her inability to remember the exact date on which Mr. Hinkston made the statements and about inconsistencies in her testimony regarding the statements. Furthermore, Deputy Westover properly authenticated Mr. Hinkston's statements under Ark. R. Evid. 901(b)(5)(1999), which provides for voice identification "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." That requirement was satisfied by Deputy Westover's testimony that she became familiar with and was also able to recognize Mr. Hinkston's voice because he talked a lot while incarcerated at the Detention Center. We conclude that the trial court did not abuse its discretion by admitting her testimony regarding statements made by Mr. Hinkston while he was in custody.[2]

### V. Arkansas Supreme Court Rule 4-3(h)

The transcript of the record in this case has been reviewed in accordance with our Rule 4-3(h) which requires, in cases in which there is a sentence to life imprisonment or death, that we review all prejudicial errors in accordance with Ark. Code Ann. § 16-91-113(a). None have been found.

---

[2] Mr. Hinkston also makes a conclusory claim that the admission of his statements might have violated his Sixth Amendment right to confront witnesses. This argument is not preserved for appellate review because it was not raised below. As we have already stated, this court does not consider arguments, even constitutional ones, raised for the first time on appeal. *Martin v. State, supra.*