
# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR–15–155

BRANDON ULYSSES WESTBROOK
APPELLANT

V.

STATE OF ARKANSAS
APPELLEE

Opinion Delivered February 3, 2016

APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIRST DIVISION
[NO. 60CR-11-1138]

HONORABLE LEON JOHNSON, JUDGE

AFFIRMED

## WAYMOND M. BROWN, Judge

A Pulaski County jury convicted appellant Brandon Westbrook of two counts of first-degree murder and one count of attempted first-degree murder. He was sentenced as a habitual offender to forty-five years' imprisonment. Appellant argues on appeal that the trial court abused its discretion "in refusing to admit into evidence expert medical testimony and lay-person testimony proffered by appellant Westbrook to establish his controlled substance induced psychosis as the cause for making false confessions on February 10, 2011, to have committed the first degree murders and the attempted first degree murder at issue." We affirm.[1]

---

[1]This is the second time this case has been before us. We originally ordered a supplemental addendum due to deficiencies. *Westbrook v. State*, 2015 Ark. App. 635.

On February 3, 2011, the Little Rock Police Department received a call regarding subjects down at a house located at 2512 Summit Street. Upon entering the house, officers found Sterling Bolden lying face down, dead, in the hallway. Officers subsequently found the owner of the house, Robert McDonald (Popcorn), lying face up in the northeast bedroom suffering from multiple gunshot wounds. He was transported to UAMS where he died from his injuries. Rose Hill, Popcorn's girlfriend, was also found in the northeast bedroom with shots to her hand and shoulder. She was lying between the bed and the wall when officers made contact with her. She was transported to the hospital for treatment.

On February 10, 2011, appellant went to his neighbors', the McCoys', house. He spoke with Ronald McCoy and informed Ronald that he had killed three people (two men and a woman) at a house on Summit Street. Police made contact with appellant later that day at the UAMS emergency room. At that time, Officer Rob Bell asked appellant why he was at the emergency room, to which he replied that he had "shot two people." Appellant was placed in custody; however, before he could be removed from the hospital, his mother approached him and asked if he had killed those people. Appellant responded by shaking his head and saying "yeah." This confession was witnessed by Sergeant Lela Folsom. Appellant was interviewed at the police station after he waived his right to remain silent. He subsequently confessed a fourth time during this interview, which was recorded. Appellant was charged with two counts of first-degree murder and one count of attempted first-degree murder.

Appellant filed a motion to suppress his custodial statement on November 15, 2011, alleging that the statement was not voluntarily made. The State filed a response on November 21, 2011, asking that appellant's motion be denied. The court denied appellant's motion to suppress following a hearing on August 29, 2012. In a pre-trial hearing held on December 17, 2013, the court addressed the State's motion in limine to prevent appellant from putting on any evidence that he was arrested while at the psychiatric unit of UAMS because appellant's defense was general denial, not a defense of not guilty by reason of mental disease or defect. The court agreed with the State that the evidence was irrelevant. The court also agreed with the State that evidence concerning the types of medication or medical treatment appellant had been given while at UAMS on February 10, 2011, was irrelevant and should not be admitted at appellant's trial.

Appellant's jury trial took place on July 23–24, 2014. At the pre-trial hearing on July 23, appellant made a motion asking the court to reconsider its decision to admit appellant's custodial confession. Appellant argued that he could not make a knowing and intelligent waiver of his rights because he was still under the influence of "sherm"[2] and medications given to him while at UAMS. The court declined to change its decision and upheld its earlier ruling on the issue. Appellant then sought to have Dr. Albert Kittrell testify as an expert that at the time appellant made the confessions, he was suffering from a substance-induced psychosis. Appellant argued that this testimony would shed light on his state of mind at the time the confessions were made and was, thus, relevant. He contended that this information

---

[2]Sherm is PCP-laced marijuana.

3

went to the weight and credibility of his confession. He further argued that if he was not allowed to introduce this testimony, he had no defense. He cited to *Crane v. Kentucky*[3] to support his position that he had a constitutional right to build a defense. The State argued that Dr. Kittrell should not be allowed to offer testimony concerning appellant's alleged psychosis because that testimony would usurp the jury's role. The court agreed and denied appellant's motion. The State informed the court that it would not introduce or play the video of appellant's confession during its case in chief. Appellant stated that the video should be played to show how appellant was "bouncing around, not staying on tract, going off on various occasions." The court agreed to let appellant play the video, without the volume, to the jury.

Rose Hill testified that she was at Popcorn's house on February 3, 2011. She stated that at some point, someone knocked on the bedroom window for Popcorn to get up. She said that she was lying in bed and that she heard Popcorn say, "Man, I told you I was tired, why y'all doing me like this?" She testified that she then heard between five and eight gunshots and saw Popcorn hit the floor. She stated that she "rolled over and hit the floor" and then "took the blanket and that's when the heater fell over [her]." She testified that she was shot in her hand and in her arm. She said that she laid on the side of the bed until she heard the police in the room. Hill opined that the shooting took place between 2:00 p.m. and 3:00 p.m. She stated that she did not see the person who shot her and that she did not make any comments to the shooter.

---

[3] 476 U.S. 683 (1986).

Julie Voegele of the Pulaski County Coroner's Office testified that she was employed as a crime-scene specialist with the Little Rock Police Department on February 3, 2011. She stated that she went to the house on Summit Street to collect evidence. She said that a total of three 9mm spent shell casings were found in the bedroom and living room of the house.

Ronald McCoy testified that appellant came to his house on the morning of February 10, 2011, just as Ronald's wife was cooking breakfast. He stated that he and appellant talked about music. Ronald said that at some point appellant stated that he had killed three people at a house on Summit Street and that he had used two guns. Ronald stated that appellant named Popcorn as one of the victims. He also stated that appellant told him that there was a female victim that appellant shot while she was lying on the floor. Ronald testified that at that point he was worried about his family's safety and wanted to get appellant outside of the house. He said that he told appellant that he needed to eat breakfast and that appellant left.[4] He stated that he subsequently contacted Sergeant Sloan and was advised to come to the police station. Ronald admitted that he was scared for himself and his wife and that they left home and did not stay there that night.

On cross-examination, Ronald stated that he and appellant were not friends and that appellant had never been to his home before that day. He said that his conversation with appellant on February 10, 2011, " evolved from music to shooting." He acknowledged that his conversation with appellant was bizarre.

---

[4]Appellant returned a short time later, but no one answered the door.

Sholenna Denay McCoy, Ronald's wife, testified that she was in the kitchen when appellant came to her home on February 10, 2011. She said that she had never met appellant before that day. She stated that she overheard the conversation appellant had with her husband and that when the topic became murder, she paid "even more attention." She reiterated what Ronald had already testified to. She said that they called the police after appellant left and that they subsequently went to the police station to give a statement. She stated that they were afraid to go back home because appellant was not in custody.

On cross-examination, Sholenna stated that she remembered telling the officers that appellant was just rambling. However, she said that rambling was the word she used to describe that appellant was talking a lot. She stated that appellant also talked about stashing evidence in a trash can by "the old folks home." She said that she did not know if appellant was bragging, but that he did not seem sorry.

Officer Bell stated that he made contact with appellant on February 10, 2011, while appellant was at the emergency room at UAMS. He stated that when he asked appellant what he was doing in the hospital, appellant replied that it was because he had "shot two people." He testified that he then took appellant into custody.

Sergeant Folsom testified that she was also present when appellant was taken into custody on February 10, 2011. She stated that as appellant was being escorted out of the emergency room, she heard appellant's mother ask appellant "if he had killed those people." She testified that appellant nodded his head, and replied, "Yeah."

Detective Tommy Hudson testified that he was one of the homicide detectives working the murders of Bolden and Popcorn. He stated that he was present when appellant was interviewed on February 10, 2011, by Det. Dewanna Phillips. He testified that the information provided by the McCoys that two guns had been used in the homicides was not contained in any police file prior to the McCoys' statements. He stated that the McCoys' statements led to appellant's arrest.

On cross-examination, Detective Hudson stated that although appellant admitted that he stashed the weapons "in a can by the old folks home," he did not investigate that information. He also stated that he was unaware if any police officer investigated appellant's claims.

Jennifer Floyd, a forensic examiner at the Arkansas State Crime Lab, testified that she received bullets from the bodies of Bolden and Popcorn. She stated that the bullets recovered were fired from two different caliber guns. She testified that Bolden was shot with a .22 caliber weapon and that Popcorn was shot with both a .22-caliber and a 9mm weapon. Floyd stated that she first made LRPD aware of her finding in May 2011.

On cross-examination, Floyd stated that she could not tell for sure how many guns had been used to fire the bullets that killed the victims.

Dr. Stephen A. Erickson, the deputy chief medical examiner at the Arkansas State Crime Lab, testified that he performed autopsies of the victims in this case. He stated that Popcorn was shot four times: behind his left ear, on the eyebrow, in the left lip, and in the abdomen. He said that it was apparent that one of the bullets was larger than the others,

7

indicating that two different calibers of bullets were used. Dr. Erickson opined that Popcorn died of multiple gunshot wounds. He said that Bolden was shot twice: on the left temporal scalp and on the back of the head just right of the midline. Dr. Erickson opined that Bolden died of gunshot wounds to the head.

On cross-examination, Dr. Erickson stated that he examined the victims' bodies on February 4, 2011. He said that Officer Mark Knowles was present at the time of the examination. He also stated that Office Knowles knew about the two firearms the day of the examinations.

Appellant renewed all of his motions once the State rested its case. Those motions were denied. Appellant then proffered the testimony of Dr. Kittrell. Dr. Kittrell stated that he is a psychiatrist at the Arkansas State Hospital and that he teaches forensic psychiatry at UAMS. He stated that he performed a forensic evaluation of appellant. He testified as follows:

> You are specifically asking me about my opinion as to mentally what was going on in Mr. Westbrook's mind on February the 10th, 2011. I gave an opinion on the mental condition of the defendant at the time of his statement to the police. Well, at the time of the statement, based on the video, he appeared to be disorganized in his speech. He made some rambling statements. It was difficult for me to follow. I think it was -- I don't want to presume, but it seemed that the interviewing officers had to clarify certain things that he said.

> My own personal, professional opinion of how he appeared, he appeared to be an individual who was psychotic and hyperactive manic at the time. As far as what causes that, those could be varied, but that's the first impression from looking at the video and even going back and reviewing the transcript of his statement at the time.

. . . .

I interviewed Mr. Westbrook two times at the Pulaski County jail. In my evaluation I do not say if I could never tell if he's telling me the truth or no. As a psychiatrist, we have no ability to discern the truth beyond what a layperson would.

He spoke with me about the drugs he was doing the days before February the 10th of 2011.

That helps supplement my opinion as to his mental condition on February 10th, 2011, when he gave his statement. It helps. If I can qualify that a little bit. He basically told me he knowingly used marijuana and did so frequently. He called it weed [which] had been laced with PCP, sherm, as he clarified and referred to it.

Having observed or studied the videos from February the 8th from Maumelle and the statement on February 10th, that follows as to my opinion as to his mental condition. I think it's consistent. If I had a known substance abuser who presented with that demeanor, made those types of statements and had no prior psychiatric treatment history, that would be the first and most likely cause of that presentation.

I am not saying he's not mentally responsible, he's not mentally retarded, nothing like that. My evaluation did not focus on that. My opinion in the report had nothing to do with that.

My opinion was that he had a substance induced psychosis. I could not definitively state what that substance was. And that is based on his not having any prior psychiatric treatment, the fact that he required treatment to -- or break it and he's now been off all medications for, what, close to two years, maybe more, and has not had any recurrence. The most likely explanation as to why he experienced a psychotic episode was that it was substance induced, even if you can't identify the substance.

Besides actually looking at the UAMS medical records, you also even showed me previous testimony of a Dr. Gregory Shane Hall. I am aware of Dr. Hall and the screenings that they gave at UAMS. I'm aware that he had a drug screen at UAMS and it was negative.

That does not in any way impact my opinion as to the psychosis. Well, if you consume an intoxicating substance it'll show up in your system for a period of time. A substance induced psychosis can appear at -- at some point after you start using the substances and remain with you for quite a period of time after all traces of the substances or substance has left your system. So it's not in any way unusual for someone to have used a substance that caused a psychotic episode and by the time the drug screen took place for nothing to show up.

Besides the statements that the defendant in the case file and on the video of the confession of February 10th, 2011, I had other reports regarding irrational claims of violence. There were other reports from the defendant and also from a police report. Those were killing Martin Luther King, killing, he said, two Mexicans and as far as I know there's nothing that seems to support that in reality.

It is typical for a drug-induced psychosis for an individual to be delusional. It would not be outside the realm of consistency for that to happen.

On cross-examination, Dr. Kittrell stated,

I didn't meet with Mr. Westbrook until over three years after the alleged events occurred.

[With regard to whether] at least part of my opinion is based on claims that he's making about what his family told him about what he said about killing Dr. Martin Luther King and the two Mexicans, the part about killing Dr. Martin Luther King, that was something he told me that his family said. And it's in the police report about him having said that he killed two Mexicans.

This is three years later that he's making some of these claims to me. Three years later that I saw him.

It's only delusional if there's no facts to back up the veracity of what he's saying. If it's reality, it's not delusional. The fact that he may have been on drugs when he committed these crimes, that doesn't mean that he wouldn't necessarily be able to remember what happened, it would not necessarily mean that, no, it would not.

Appellant again asked the court to reconsider its ruling to allow certain testimony to be admitted during the trial. The court stood by its prior rulings.

Melissa Myhann, the forensic DNA supervisor at the Arkansas State Crime Lab, testified that cigarette butts found at the house were tested, and that appellant was excluded as a contributor to any DNA on those cigarette butts.

On cross-examination, Myhann testified that no DNA profile was recovered from the shell casing found at the scene. She explained what the absence of DNA meant as far as whether or not someone was in a room:

It really depends on what kind of contact is made between items, how the sample's collected, how it's stored. Just because DNA -- just because we don't obtain the DNA profile from an item doesn't mean it wasn't touched or handled by an individual, it just means that there wasn't either enough there for us to obtain a profile or it may be a partial profile. We just don't have enough to make a comparison. Simply stated, just because there's no DNA doesn't mean somebody wasn't there.

Detective Phillips testified that she was the lead detective in the homicide, which took place on February 3, 2011. She stated that she came into contact with appellant on February 10, 2011, at the emergency room at UAMS. She said that she conducted an interview of appellant on February 10 and that the interview was recorded.[5] She stated that an attempt was made to recover the evidence that appellant said was placed into trash cans but that they were unsuccessful in finding it.

On cross-examination, Detective Phillips stated that if the evidence had been placed where she was led to believe, it would have already been collected by the garbage men.

Appellant then introduced the proffered testimony of Marscelle Reed. Ms. Reed testified that she was a detention officer at the Pulaski County Regional Detention Facility. She stated that she knew appellant from working at the detention center and that she had no independent relationship with appellant. She stated in pertinent part,

---

[5]At this point in the testimony, the video of the interview was played for the jury. However, there was no audio of the interview, as per the court's earlier ruling. A transcript of the video was subsequently proffered.

I came into contact with him when he was originally arrested on these charges. That contact was in T Unit, the seg unit. I don't know the exact date, I'm not sure.

I do not know if it was the actual date that he was first arrested and brought to the Pulaski County Detention Facility. I'm not really sure of the exact date. I'm just not really sure of the exact date, but I did see him when he first came in. I think that was it, the day, I believe that day or the next day.

I observed what happened. He was disoriented. He didn't know who he was and he didn't know who I was. I was trying to orient him to where he was at. He didn't know he was in the jail and he was calling me Brenda, he was calling me mother, mom and stuff. He didn't really know where he was at. I don't have any independent experience like in psychology or anything like that. But that's my observations.

Appellant testified that he had smoked PCP-laced marijuana around February 7, 2011. He stated that as a result, he went around "acting crazy, so [his] momma tried to take [him] to the hospital." He said that he knew the marijuana was laced because it "tasted funny." Appellant testified that he had no independent memory of talking to the McCoys, going to the hospital, or going to jail. Appellant stated that he learned about what happened February 3, 2011, on Summit Street from Corey Young (Smoke), who is now deceased. He said that he had also talked to his mother about the shooting. Appellant denied owning any firearms in February; he also denied having any reason to shoot the victims. Appellant stated that he did not kill the victims and that he did not shoot Hill. He said that he was trying to get some tires for his truck on February 3, 2011, and that he had been with his aunt the first part of that day. He further testified as follows:

Why I told people that I shot people was when I was laced, I went crazy and all type of stuff. And things that I heard and -- So when I was on drugs, went hollering like -- So, in other words, I was just hollering out the side of my neck as you call it, I guess. Like words and stuff that I done heard and saying that I killed these people, that I killed Mexicans and I killed Martin Luther King, I killed my cousin.

Appellant testified on cross-examination as follows:

I am not telling this jury that I did not say that I killed three people. I am not denying that the words that I told Mr. McCoy were that it was a two guys and a girl. I guess so. I don't know if they said three people or two guys and a girl. I would have to see the motion to see what they said.

I am not denying that I said it to them. I am not denying that I said that it was a house on Summit. I am not denying that I said that one of them was Popcorn. I am not denying that I told them that there were two guns. I am not denying that I told them that the woman was wrapped in a bed sheet or a blanket.

I am able to remember some things but not others.

When I was talking about Mexicans and Martin Luther King, I am not telling the jury I remember that. [With regard to whether] I want the jury to believe that I said it, but I don't remember saying it, it was in the police report. I don't have any independent recollection of saying that.

I said that this marijuana cigarette was laced with PCP. I had not smoked PCP cigarettes before.

Appellant further testified that he did not remember the interview with the homicide detectives but that he had been shown a video recording of that interview. He acknowledged that the toxicology test taken at UAMS on February 10, 2011, was negative for drugs.

On redirect, appellant stated, "I will look these people in the eye and tell them whether I shot Mr. Bolden. I did not shoot Mr. Bolden. I did not shoot Mr. McDonald. I did not shoot Ms. Hill."

Andrea Madden, appellant's mother, testified that she saw appellant on Gaines Street around 3:00 p.m. on February 3, 2011. She stated that she went to the crime scene on Summit Street and learned from "someone on three [sic] street" what had happened. She said

that she relayed this information to appellant. She stated that appellant does not own any pistols and that he is "truthful."

On cross-examination, Madden stated that she loved appellant and that she would do everything she could to protect him. She said that she told the police that she had gone to the crime scene and had given appellant information that she had learned. She testified that the police must have left this information out of her statement. She admitted that she did not trust the police. Madden stated that she took appellant to the hospital on February 10, 2011. However, she denied asking him whether or not he had killed anyone. According to Madden, she asked Detective Phillips if appellant had committed the crimes. She stated that she never told the police that she knew that appellant did not commit the shootings because she had seen him on Gaines Street on the date in question because she was in shock.

On redirect, Madden stated that she had talked to the police approximately three times. She said that just because she loved appellant did not mean that she was lying to the jury.

On recross-examination, Madden stated that the only information she had about Summit Street was that three people were killed. She said that she did not know what happened inside the house on Summit Street.

Joyce Dutcher, appellant's aunt, testified that on February 3, 2011, appellant was on Gaines Street waiting for her around 3:00 p.m. so that she could give him a coupon for some tires.

On cross-examination, Dutcher stated that she met with appellant at 3:15 p.m. on February 3, 2011, on Gaines Street. According to Dutcher, she was running late because she

was supposed to meet appellant at 3:00 p.m. She admitted that she had not provided the police with this information.

On redirect, Dutcher contended that everything she testified to was the truth.

At the conclusion of the defense's case, appellant renewed all previous motions. The court denied the motions.

Dr. Greg Hall testified on rebuttal that he performed a toxicology test on appellant on February 10, 2011, and that there were no drugs in appellant's system, including PCP.

On cross-examination, Dr. Hall stated that he did not personally conduct the tests, but that he was referring to the results reported from the lab.

Detective Phillips testified on rebuttal that Madden would call her "pretty regular" about appellant's case. She stated that she had known Madden for a long time. She denied that Madden had admitted to providing appellant with the information concerning the shooting on Summit Street, and said that if Madden had, that information would have been put in the case file.

On cross-examination, Detective Phillips stated that she and Madden grew up in the same neighborhood and that they talked on a regular basis. She said she did not take notes if "somebody just wanted to talk."

The court then allowed appellant to proffer the testimony of Dutcher and Madden. Dutcher stated that she had gone with Madden to take appellant to the State Hospital in February 2011. She said that they would not admit appellant until he had an assessment performed at UAMS. She testified that appellant

was acting kind of erratic, part of the time, he seemed okay and we just wanted to take him -- we felt like he needed to go to the State Hospital because he wasn't himself that day. He just seemed kind of agitated. He would sometimes ask me about my son, too. My son was killed and it was messing with all of us. And he would sometimes say something about that. And his car was messing up and everything. He just seemed a bit agitated. [He was not acting like he normally does,] right.

Madden testified that appellant had begun to act agitated on February 8, 2011, and had begun to say things that were not true. For example, she said that appellant began saying that he had been to prison for eight years, when, in fact, he had never been to prison. She stated that she ended up calling the police to her residence due to appellant's behavior. She said that appellant never said anything about killing someone on that day. She stated that appellant had accused her of being "a director of the whole movie" against him.

At the conclusion of all of the evidence, the jury received its instructions. The parties then presented closing arguments. The State contended that appellant was guilty of the murders of Bolden and Popcorn, as well as the attempted murder of Hill. The defense argued that appellant's confessions were false and were the result of appellant being under the influence of sherm. The jury deliberated and found appellant guilty of the charges against him. The jury recommended that appellant serve an aggregate term of forty-five years' imprisonment. The court followed the jury's recommendation and sentenced appellant to forty-five years in the Arkansas Department of Correction. The sentencing order was entered on July 31, 2014. Appellant filed a timely notice of appeal on August 26, 2014. This appeal followed.

Appellant argues that the court abused its discretion in refusing to admit appellant's proffered expert and lay testimony to establish that appellant's substance-induced psychosis caused him to falsely confess to a crime that he did not commit.

The decision to admit or exclude evidence is within the sound discretion of the trial court, and we will not reverse the court's decision regarding the admission of evidence absent a manifest abuse of discretion.[6]  The general test for admissibility of expert testimony is whether the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue.[7]  An important consideration in determining whether the testimony will aid the trier of fact is whether the situation is beyond the ability of the trier of fact to understand and draw its own conclusions.[8]  Where the introduction of expert testimony would invade the function of the jury or where it does not help the jury, the testimony is not admissible.[9]

Appellant argues that the proffered testimony was admissible because it was relevant. Under Rule 403[10] of the Arkansas Rules of Evidence, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of having an unfair prejudicial impact on the jury, confusion of the issues, misleading the jury, or by considerations of undue

---

[6]*Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325.

[7]*Id.*

[8]*Id.*

[9]*Id.*

[10](2015).

delay, waste of time, or needless presentation of cumulative evidence. Arkansas Rule of Evidence 704[11] governs expert opinions touching on the ultimate issue and provides that testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Arkansas Rule of Evidence 702[12] provides that a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.

Here, appellant conceded that he was not asserting an insanity defense. In light of his decision to not raise that defense, any testimony concerning his substance-induced psychosis was not relevant.[13] Lay testimony about appellant's behavior on the day of his confessions was likewise irrelevant. Therefore, the court did not abuse its discretion in preventing appellant from introducing this testimony.

Next, appellant contends that the proffered testimony was admissible because he had a fundamental constitutional right to present a defense that was central to his claim of innocence. He argues that his defense strategy was to persuade the jury that his confessions

---

[11](2015).

[12](2015).

[13]*See Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000).

were false and that this strategy was hindered by the court's rulings. He cites *Crane v. Kentucky*[14] to support his contention.

In *Crane,* the United States Supreme Court held that, whether under the Due Process Clause of the Fourteenth Amendment or under the Compulsory Process or Confrontation Clauses of the Sixth Amendment, a criminal defendant has a right to a fair opportunity to present a defense. Appellant maintains that he was denied this right by the court's rulings. This argument is without merit.

Appellant was able to put forth a defense through testimony and through the cross-examination of witnesses. Appellant took the stand in his own defense and stated that he falsely confessed to the crimes because he was under the influence of sherm. He was also able to show how he presented on February 10, 2011, by playing a video (the volume was not played before the jury) of his interview with homicide detectives. Testimony concerning appellant's alleged mental state and/or substance-induced psychosis was not relevant to his defense of innocence, and it would have usurped the jury's function of being the judge of credibility. Despite appellant's claims, he was able to put on his defense. Therefore, we hold that the court did not abuse its discretion by preventing appellant from introducing this testimony.

Affirmed.

GLADWIN, C.J., and ABRAMSON, J., agree.

*Llewellyn J. Marczuk*, Deputy Pub. Def., and *Clint Miller*, Deputy Pub. Def., for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Evelyn D. Gomez*, Ass't Att'y Gen., for appellee.

---

[14]476 U.S. 683 (1986).